## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MICHAEL CASTRODALE and RONALD SYKES, Derivatively on Behalf of LANNETT COMPANY, INC.,

Plaintiffs,

vs.

ARTHUR P. BEDROSIAN, TIMOTHY C. CREW, MARTIN P. GALVAN, JOHN KOZLOWSKI, DAVID DRABIK, JEFFREY FARBER, PATRICK LEPORE, JAMES M. MAHER, ALBERT PAONESSA, III, JOHN C. CHAPMAN, and PAUL TAVEIRA,

Defendants,

-and-

LANNETT COMPANY, INC.,

Nominal Defendant.

Case No.: 1 9 - 1 7 4 6

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY DEMANDED**

2019 SEP 17  PM 3: 34

Plaintiffs Michael Castrodale and Ronald Sykes ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Lannett Company, Inc. ("Lannett" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including (a) internal documents obtained from Defendants pursuant to Confidentiality Agreement; (b) public filings made by the Company, other parties, and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publicly disseminated publications; (d) news articles, shareholder communications, concerning the

Company's public statements; (e) the proceedings in a related securities class action, entitled *Utesch v Lannett Co., Inc.*, No. 2:16-cv-05932-WB (E.D. Pa.) (the "Securities Class Action"); (f) the proceedings brought by the attorneys general of 40 states, captioned *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056 (D. Conn.) and its related actions (the "State AG Action")[1]; (g) the antitrust class actions consolidated under the caption *In re: Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (E.D. Pa.) (the "Antitrust Action"); (h) the U.S. Department of Justice's ("DOJ") criminal investigation and indictments relating to the price fixing conspiracy (the "DOJ Probe"); and (i) other publicly available information regarding the Company and the Individual Defendants (defined below).

## NATURE OF THE ACTTION

1.      This is a shareholder derivative action (a demand refused derivative action) brought on behalf of and for the benefit of Lannett, against certain of its officers and/or directors named as defendants herein seeking to remedy Defendants (defined below) violations of Section 14(a) of the of the Securities Exchange Act of 1934 (the "Exchange Act"), and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from July 15, 2014 to the present ("Relevant Period 1") and relating to the Company's alleged participation in various antitrust schemes, and from February 8, 2018 to the present ("Relevant Period 2") relating to the Company's misconduct surrounding its agreement with Jerome Stevens Pharmaceuticals ("JSP"). Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to the Company, including damages to its reputation and goodwill.

2.      The Company develops, manufactures, packages, markets, and distributes solid oral

---

[1]      References herein to allegations in the "State AG Action 1" refer to its Amended Complaint filed on June 15, 2018. State AG Action 2 refers to its separate Complaint filed on or about May 10, 2019.

(tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address a wide range of therapeutic areas. The Company derives the majority of its revenue from the sale of drugs that are bioequivalent to certain patented drugs once their patent expires. At least six of the Company's drugs are part of various antitrust actions:

- Doxycycline Monohydrate;
- Levothyroxine;
- Digoxin;
- Acetazolamide;
- Ursodiol; and
- Baclofen.

3.      And two of those drugs are part of the JSP Agreement:

- Levothyroxine and
- Digoxin

4.      The following is a partial timeline of relevant events relating to the Company's alleged participation in various the antitrust schemes and the Company's misconduct surrounding its agreement with JSP, which events are more fully discussed herein:

- March 23, 2004 – The JSP Agreement;
- 2013 (and possibly earlier) – Start of the Company's participation in antitrust schemes;
- August 19, 2013 – The JSP Agreement extension to March 23, 2019;
- 2014 – The DOJ and State AG investigations into price fixing and antitrust schemes begin;
- July 2014 – The Company receives State AG interrogatories and subpoena;

3

- November and December 2014 – The Company, Kevin Smith and others served with DOJ grand jury subpoenas;

- June 2016 – The Company's employee served with State AG interrogatories and subpoena;

- 2016 – Start of Private Antitrust, Consumer Protection, and Shareholder lawsuits against the Company and others;

- December 2016 – The State AG Action commenced (the Company not a party at this time);

- December 2016 – The Heritage executives criminally charged with antitrust scheme;

- January 2017 – The Heritage executives plead guilty;

- August 15, 2017 – The Direct Purchaser complaint against the Company and others regarding Digoxin price fixing;

- September 25, 2017 – The Company announced that Arthur Bedrosian ("Bedrosian") would step down as Chief Executive Officer ("CEO");

- December 31, 2017/January 2018 – Bedrosian as CEO ends and Timothy Crew ("Crew") as CEO begins;

- May 14, 2018 – The Company served with DOJ Civil Investigative Demand regarding antitrust scheme;

- June 18, 2018 – The State AG Action 1 adding the Company and new drugs, including Doxy Mono;

- June 30, 2018 – Kevin Smith (the Company's Sr. VP of Sales and Marketing) leaves Company;

4

- August 15, 2019 – The Court denies joint motions to dismiss the Overarching Conspiracy claims;

- May 10, 2019 – The State AG Action 2 filed; includes the Company and Levothyroxine;

- May 31, 2019 – The Heritage criminally charged with antitrust scheme & admitted wrongdoing; and

- August 30, 2019 – Martin P. Galvan ("Galvin") (the Company's Chief Financial Officer ("CFO")) retires.

**The JSP Agreement**

5.     The Company's primary supplier of bioequivalent drugs is JSP.  Under the terms of a distribution agreement, the Company receives drugs from JSP and sells them to the market.  This distribution agreement—referred to herein as the JSP Agreement—was initially negotiated by the Company's former CEO, Bedrosian, in March 2004.  The JSP Agreement significantly favored the Company by limiting JSP to increasing costs by 3% annually, while permitting the Company unfettered retail price increases to as much as the market could handle.  The JSP Agreement had no profit-sharing provisions but did provide JSP with 4 million shares of the Company common stock, and an additional 1.5 million shares at renewals.

6.     The JSP Agreement was essential to the Company's success as purchases of finished goods from JSP accounted for 37% of the Company's inventory purchases in fiscal year 2018, 36% in fiscal year 2017 and 52% in fiscal year 2016.  JSP supplied one of the Company's most successful drugs, Levothyroxine Sodium Tablets USP, whose net sales totaled $253.1 million, $187.0 million and $190.4 million in fiscal year 2018, 2017 and 2016, respectively, or 37%, 30% and 35% of total net sales, respectively.  Another of the Company's key products, Digoxin Tablets, was also supplied

by JSP.  Net sales of Digoxin tablets totaled $4.9 million and $9.5 million in fiscal years 2018 and 2017, respectively.  Levothyroxine Sodium and Digoxin collectively accounted for 37% and 29% of the Company's total net sales in fiscal year 2018 and 2017, respectively.

7.      After twelve (12) years of assisting the Company navigate the critical relationship with JSP, including extending the initial contract in August 2013, Bedrosian was pushed out, and on September 25, 2017, the Company announced that Bedrosian would step down as soon as a new CEO was appointed.  On December 21, 2017, the Company announced that Defendant Crew would succeed Bedrosian, effective January 2, 2018.

8.      The Company, immediately recognizing that Bedrosian's departure might jeopardize the relationship with JSP, stated in the February 8, 2018 Quarterly Earnings Call that Bedrosian would be remaining on in a "strategic advisory role of the company" and "will be focused on transitioning and strengthening our relationships with our key alliance partners of JSP."  This was not enough, especially given the overhaul in core management that the new CEO, Crew performed in an effort to cut costs and onboard Crew's cronies from previous pharmaceutical positions.  The loss of Bedrosian's leadership combined with Defendant Crew's new team and cost-cutting measures spelled the end for the JSP relationship.

9.      As the Company's relationship with JSP became more strained, JSP made moves to form strategic alliances with other drug distributors, yet despite these circumstances which made non-renewal of the agreement more imminent, Defendants continued to portray that it was business as usual for the Company, and failed to disclose that the Company was on the cusp of losing the JSP Agreement .

10.      Despite the increased unlikelihood of renewal of the JSP Agreement, on February 8, 2018, during a Quarterly Earnings Call, Defendant Crew stated: "We obviously have a very long

mutually beneficial relationship with the JSP, they are a significant shareholder and would be happy to add that to their share base.  I'm optimistic, because of the number of things we have going on between the two companies that there is a big need for us to continue to partner as we have in the past."

11.    Throughout the Relevant Period, Defendants continued to make similar false and misleading statements and omissions regarding the Company's business, operations, and compliance policies.  Defendants made false and/or misleading statements and/or failed to disclose that: (a) JSP would not be renewing the distribution agreement with the Company; and (b) as a result of the foregoing, the Company's public statements were false and misleading at all relevant times.

12.    On August 20, 2018, Defendants caused the Company issue a press release, stating:

*Lannett Company, Inc, today said that its distribution agreement with Jerome Stevens Pharmaceuticals (JSP), which expires on March 23, 2019, will not be renewed.*

*The Steinlauf family advised us this past Friday evening that they will not renew our agreement to distribute three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP, Digoxin Tablets USP and Levothyroxine Sodium Tablets USP, upon its expiration in March 2019,"* said Tim Crew, chief *executive officer of Lannett.* "The family has assured us of a continuous supply of the products through March of next year.  These products remain valuable assets for us and are expected to significantly contribute to our financial performance in fiscal 2019.  "While we are disappointed and intend to redouble our continuing efforts to explore options for addressing our capital structure, we have been preparing for this contingency, knowing that this outcome was a possibility."  [Emphasis added].

13.    Upon the news of the non-renewal, the Company's share price dropped $8.15, or 60.3%, to close at $5.35 on August 20, 2018.

**Antitrust Enforcement Action**

14.    On June 18, 2018, the Company was named in an antitrust enforcement action lead by the Connecticut Attorney General ("CTAG").  The Company is also the subject of an ongoing

criminal investigation conducted by the Department of Justice ("DOJ"), which concerns the same underlying wrongdoing that underlies the CTAG's complaint. Further, more than 100 private antitrust lawsuits were filed against the Company regarding its anticompetitive price-fixing agreements, which were consolidated into a multidistrict litigation ("MDL").

15.     Defendants went out of their way to conceal their fraudulent conduct, offering a variety of excuses for the price increases, such as industry consolidation, plant closures mandated by the U.S. Food and Drug Administration ("FDA"), and/or elimination of unprofitable product lines. Defendants have used an array of forums to spread these lies, including conference calls with analysts, industry conferences, press releases, and even regulatory disclosures.

## JURISDICTION AND VENUE

16.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

17.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) the Company maintains its principal place of business and/or is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants'

primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

<div align="center">

**PARTIES**

</div>

**Plaintiffs**

19.     ***Plaintiff Michael Castrodale*** ("Plaintiff Castrodale") acquired Lannett securities during the Relevant Period and will continue to hold Lannett shares throughout the pendency of this action.  Plaintiff Castrodale will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

20.     ***Plaintiff Ronald Sykes*** ("Plaintiff Sykes") acquired Lannett securities during the Relevant Period and will continue to hold Lannett shares throughout the pendency of this action. Plaintiff Sykes will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

21.     Nominal Defendant Lannett is a Delaware corporation with its principal executive offices at 9000 State Road, Philadelphia, Pennsylvania 19136.  The Company's shares trade on the NYSE under the ticker symbol "LCI."

**Director Defendants**

22.     Defendant Crew has served as the Company's CEO and as a director since January 2018.   For the fiscal year ended June 30, 2018, Defendant Crew received $1,329,781 in compensation from the Company, which included $350,539 in salary, $400,016 in restricted stock awards, $126,252 in option awards, and $52,971 in all other compensation.

<div align="center">

9

</div>

23. **Defendant David Drabik** ("Drabik") has served as a Company director since January 2011. Defendant Drabik is and has served as a member of the following committees:

- Audit Committee – 2014 through the present;

- Compensation Committee – 2014 (Chair in 2014) through the present;

- Strategic Planning Committee – 2015 through the present; and

- Governance and Nominating Committee – 2014 through present (Chair).

24. For the fiscal year ended June 30, 2018, Defendant Drabik received $266,006 in compensation from the Company, which included $116,000 in fees earned and $150,006 in stock awards.

25. During the Relevant Period, Defendant Drabik (who is also an "Insider Trading Defendant") made the following sale of Company stock:

| Date | No. of Shares | Price | Proceeds |
|------|---------------|-------|----------|
| 02/08/15 | 12,500 | $61.55 | $769,375 |

26. **Defendant Jeffrey Farber** ("Farber") has served as a Company director since May 2006 and as Chairman of the Board from July 2012 to July 1, 2018. Defendant Farber is and has served as a member of the Strategic Planning Committee from at least 2014 to the present. Defendant Farber initially joined the Company in August 2003 as Secretary. For the fiscal year ended June 30, 2018, Defendant Farber received $247,006 in compensation from the Company, which included $97,000 in fees earned and $150,006 in stock awards.

27. During the Relevant Period, Defendant Farber (who is also an "Insider Trading Defendant") made the following sales of company stock:

| Date | No. of Shares | Price | Proceeds |
|------|---------------|-------|----------|
| 02/12/15 | 25,000 | $58.12 | $1,453,000 |
| 02/13/15 | 10,000 | $58.32 | $583,200 |

28. In addition, Defendant Farber is the owner of Auburn, a generic distributor used by

the Company.  During the fiscal years ended June 30, 2018, 2017, and 2016, the Company attributed net sales of $3.9 million, $3.7 million and $3.1 million, respectively, to Auburn. The Company's accounts receivable also included amounts due from Auburn of $585,000 and $751,000 at June 30, 2018 and 2017, respectively.

29.    **Defendant Patrick G. LePore** ("LePore") has served as a Company director since July 2017 and as Chairman of the Board since July 2018.  Defendant LePore also is and has served as a member of the Governance and Nominating Committee and the Strategic Planning Committee since 2017.  For the fiscal year ended June 30, 2018, Defendant LePore received $129,785 in compensation from the Company, which included $94,000 in fees earned and $35,785 in stock awards.

30.    **Defendant Albert Paonessa, III** ("Paonessa") has served as a Company director since July 2015.  Defendant Paonessa has been a member of the Strategic Planning Committee since 2015 and has served as its Chairman since 2017.  Defendant Paonessa was also a member of the Compensation Committee from 2015 through 2017.  For the fiscal year ended June 30, 2018, Defendant Paonessa received $248,006 in compensation from the Company, which included $98,000 in fees earned and $150,006 in stock awards.

31.    In addition, since May 2017, Defendant Paonessa has served as the CEO of KeySource, a generic distributor used by the Company.  During the fiscal years ended June 30, 2018 and 2017, the Company attributed net sales of $1.9 million and $1.7 million to KeySource. The company's accounts receivable also included amounts due from KeySource of $514,000 and $606,000 as of June 30, 2018 and 2017.

32.    **Defendant Paul Taveira** ("Taveira") has served as a Company director since May 2012.  Defendant Taveira is and has served as a member of the following committees:

- Audit Committee – 2014 through the present;

- Governance and Nominating Committee – 2014 through the present; and

- Compensation Committee – 2014 through present (Chair from 2015 to the present).

33.     For the fiscal year ended June 30, 2018, Defendant Taveira received $240,006 in compensation from the Company, which included $90,000 in fees earned and $150,006 in stock awards.

34.     During the First Relevant Period, Defendant Taveira (who is also an "Insider Trading Defendant") made the following sales of company stock:

| Date | No. of Shares | Price | Proceeds |
|------|---------------|-------|----------|
| 06/16/14 | 1,000 | $46.94 | $46,940.00 |
| 03/06/15 | 2,500 | $63.07 | $157,675.00 |

35.     ***Defendant John C. Chapman*** ("Chapman") has served as a Company director since July 2018.  Defendant Chapman also serves as Chairman of the Audit Committee and as a member of the Compensation Committee effective August 21, 2018.

36.     Defendants Crew, Drabik, Farber, LePore, Paonessa, Taveira, and Chapman are herein referred to as "Director Defendants."

**Former Director Defendants**

37.     Defendant Bedrosian served as the Company's President from May 2002 until December 2014 and as the Company's CEO from January 2006 until his departure from the Company in January 2018.  Defendant Bedrosian also served as the Company's Vice President of Business Development in January 2002 until April 2002 and served as a Company director from February 2000 to January 2002.  Defendant Bedrosian was re-elected as a director in January 2006 and served as a Company director until his departure on December 31, 2017.  Defendant Bedrosian

was a member of the Strategic Planning Committee from 2014 through 2017 and served as its Chairman in 2014.

38.   Although Defendant Bedrosian left the Company on December 31, 2017, according to the Company's Schedule 14A filed with the SEC on December 10, 2018 (the "2018 Proxy Statement"), for the fiscal year ended June 30, 2018, Defendant Bedrosian received $3,617,957 in compensation from the Company, which included $381,635 in salary, $551,249 in restricted stock awards, $34,999 in option awards, and $2,650,074 in all other compensation.

39.   During the Relevant Period, Defendant Bedrosian (who is also an "Insider Trading Defendant") made the following sales of Company stock:

| Date | No. of Shares | Price | Proceeds |
|------|---------------|-------|----------|
| 07/15/14 | 5,000 | $47.19 | $235,950 |
| 08/18/14 | 5,000 | $41.30 | $206,500 |
| 09/16/14 | 5,000 | $40.05 | $200,250 |
| 10/15/14 | 5,000 | $40.22 | $201,100 |
| 11/17/14 | 5,000 | $47.70 | $238,500 |
| 12/15/14 | 5,000 | $43.81 | $219,050 |
| 01/15/15 | 5,000 | $43.50 | $217,500 |
| 02/17/15 | 5,000 | $59.89 | $299,450 |
| 04/15/15 | 5,000 | $69.43 | $347,150 |
| 05/15/15 | 5,000 | $53.27 | $266,350 |
| 06/15/15 | 5,000 | $56.31 | $281,550 |
| 07/15/15 | 5,000 | $61.92 | $309,600 |
| 08/17/15 | 5,000 | $52.81 | $264,050 |
| 09/15/15 | 5,000 | $55.64 | $278,200 |

40.   ***Defendant James M. Maher*** ("Maher") served as a Company director from June 2013 until August 21, 2018. For the fiscal year ended December 31, 2018, Defendant Maher received $240,006 in compensation from the Company. This included $90,000 in fees earned and $150,006 in stock awards. Defendant Maher served as a member of the following committees:

- Audit Committee – 2014 through 2017 as its Chairman;

- Governance and Nominating Committee – 2014 through 2017; and

13

- Compensation Committee – 2014 through 2017.

41.     During the Relevant Period, Defendant Maher (who is also an "Insider Trading Defendant") made the following sale of company stock:

| Date | No. of Shares | Price | Proceeds |
|------|---------------|-------|----------|
| 09/01/16 | 1,478 | $33.91 | $50,118 |

**Officer Defendants**

42.     Defendant Galvan served as the Company's Vice President of Finance and Chief Financial Officer ("CFO") since August 2011.  For the fiscal year ended June 30, 2018, Defendant Galvan received $763,745 in compensation from the Company, which included $415,000 in salary, $207,505 in restricted stock awards, $24,997 in option awards, $86,730 in non-equity incentive plan compensation, and $29,513 in all other compensation.

43.     Defendant Galvan retired from the Company as its Vice President of Finance and CFO, effective August 30, 2019.  As stated in the Form -K filed with the SEC on May 24, 2019:

> Martin P. Galvan, the Vice President of Finance and Chief Financial Officer at Lannett Company, Inc. (the "Company"), will retire and will terminate his employment with the Company effective August 30, 2019, after the completion of the audit for the Company's fiscal year ending June 30, 2019 and the filing of the Company's Annual Report on Form 10-K for the fiscal year ending June 30, 2019. The termination of Mr. Galvan's employment will be deemed to be a termination by the Company without Cause, as such term is defined in the Amended and Restated Employment Agreement between the Company and Mr. Galvan dated as of December 31, 2012.

44.     ***Defendant John Kozlowski*** ("Kozlowski") now serves as the Company's Vice President of Finance and CFO of the Company effective August 31, 2019.   Prior to this position Defendant Kozlowski served as the Company's Chief of Staff and Strategy Officer since April 2018.  Prior to that, Defendant Kozlowski served as the Company's Chief Operating Officer in October 2017, Vice President of Financial Operations & Corporate Controller in 2016, and as Corporate Controller in 2009 when he joined the Company.  For the fiscal year ended June 30,

2018, Defendant Kozlowski received $596,314 in compensation from the Company. This included $325,000 in salary, $171,624 in restricted stock, $67,921 in non-equity incentive plan compensation, and $31,796 in all other compensation.

45.     The Director Defendants and Defendants Bedrosian, Maher, Galvan and Kozlowski are herein referred to as "Defendants."

**Non-Party Director**

46.     ***Non-Party Melissa V. Rewolinski, Ph.D.*** ("Rewolinski") was appointed as a Director of the Company on May 20, 2019, to become effective July 1, 2019.

**Non-Party Officers**

47.     ***Non-Party Maureen Cavanaugh*** ("Cavanaugh") joined the Company as Senior Vice President and Chief Commercial Operations officer in 2018.  Cavanaugh is responsible for overseeing operations including sales and marketing, research and development (R&D) and regulatory affairs. Prior to joining the Company, Cavanaugh was the senior vice president, chief commercial officer, North America Generics, at Teva Pharmaceuticals USA ("Teva"), where she held that position for the last five of her eight years at Teva.  Cavanaugh is a named defendant in the State AG Action.

48.     ***Non-Party Tracy Sullivan DiValerio*** ("Sullivan") has been employed at the Company since 2007 and is currently the Director of National Accounts.  Sullivan is a named defendant in the State AG Action.

49.     ***Non-Party Kevin R. Smith*** ("Smith") joined the Company in January 2002 as Vice President of Sales and Marketing, and ultimately was promoted to the position of Senior Vice President of Sales and Marketing.   On June 22, 2018, the Company announced that Smith "…will terminate his employment with the Company effective June 30, 2018."  On June 15, 2018, Smith

exercised options of the Company for $192,600.  A review of his stock trading history shows he sold Company stock several times during the height of its value in 2014 and 2015.

## THE COMPANY CORPORATE GOVERNANCE

50.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

51.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

52.     In seeking to meet its corporate governance responsibilities the Company has and publishes on its website, four governance memos: (1) Code of Business Conduct and Ethics, (2) Corporate Governance Guidelines, (3) Whistleblower Policy, and (4) Board Diversity Policy. Additionally, the Company maintains four Board level committees; (1) Audit Committee, (2) Compensation Committee, (3) Governance and Nominating Committee, and (4) Strategic Planning Committee.

### Code of Business Conduct and Ethics

53.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") states that it "has been adopted to foster and promote a common set of fundamental values and operating principles. This Code applies to all employees, officers and directors, of the Company and its subsidiaries."

54.     The Code of Conduct provides that the Company's employees, officers, and directors should avoid gaining unfair advantages through, *inter alia*, misrepresenting material facts.

16

The Code of Conduct specifically states that "[e]ach employee, officer and director should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice."

55.     Under a section titled, "Company Assets," the Code of Conduct outlines the responsibility of the Company employees, officers, and directors with respect to Company assets, stating in relevant part, "[a]ll employees, officers and directors shall protect the Company's assets and ensure they are being used efficiently and for legitimate business purposes. Theft, carelessness and waste have a direct impact on the Company's profitability.

56.     The Code of Conduct also emphasizes the Company's compliance with laws and regulations, stating in relevant part:

**Compliance**

The Company promotes compliance with laws, including insider trading laws, and rules and regulations such as Standard Operating Procedures (SOPs), current Good Manufacturing Practices (cGMPs), Good Laboratory Practices (GLPs). The Company will conduct periodic audits of compliance with the Code and investigations will be performed to determine validity of any allegations of wrongdoing. Violations of the Code will be addressed promptly and consistently upon the outcome of such investigations. Anyone determined to be involved in such violations will face disciplinary penalties up to including termination, as appropriate.

57.     The Code of Conduct also provides reporting guidelines for suspected violations of laws, rules, regulations, or the Code of Conduct stating in relevant part:

**Reporting**

The Company promotes ethical behavior and encourages employees to talk to supervisors, managers or other appropriate personnel when in doubt about the best course of action in a particular situation. Additionally, employees are required to report violations of laws, rules, regulations or the Code to appropriate personnel. In order to encourage reporting of such violations it is Company policy to prohibit retaliation for reports made in good faith. Any person who takes action in retaliation against an employee who has raised an issue in good faith will be subject to

17

disciplinary actions up to and including termination, as appropriate.

58.     Defendants violated the Code of Conduct by allowing the Company to engage in the Anti-Competitive Misconduct in violation of applicable state and federal laws, and the scheme to issue materially false and misleading statements to the public and to facilitate and disguise Defendants' insider sales and violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

**Corporate Governance Guidelines**

59.     The Company's undated Corporate Governance Guidelines represents that the Company has an insider trading policy.  No insider trading policy is published on the Company's website and is not included in any of its corporate governance documents other than brief mentions in its Code of Conduct and herein.  The Company's Corporate Governance Guidelines provide in relevant part:

> The Board of Directors (the "Board") of Lannett Company, Inc. (the "Company") has adopted the corporate governance guidelines (the "Guidelines") set forth below to promote the effective functioning of the Board and its committees, to promote the interests of the stockholders, and to provide a common set of expectations for the Board, its committees, individual Directors and management. The Board shall regularly review the Guidelines for appropriateness and effectiveness.

> **Board Role and Responsibilities**

> The Board is elected by the Company's stockholders *to provide oversight of the Company's business and affairs*. Among its duties, the Board shall appoint the Company's Chief Executive Officer (the "CEO"), approve the appointment of the executive officers, monitor the operating performance and financial condition of the Company, ensure the Company's adherence to corporate governance standards, approve significant transactions, and establish the strategic direction of the Company.  The Company's officers are responsible for presenting strategic plans to the Board for review and approval and for implementation of such plans. *The Board is also responsible for reviewing the major risks facing the Company and helping develop strategies to address these risks, and establishing policies designed to maintain the financial, legal and ethical integrity of the Company*.

> * * *

18

**Committees of the Board**

The Board has four standing committees: Audit Committee, Compensation Committee, Governance and Nominating Committee, and Strategic Planning Committee. The Board may establish and maintain other committees and/or subcommittees from time to time as it deems necessary and appropriate. Each committee and/or subcommittee shall operate under a written charter approved by the Board. Each committee shall report regularly to the Board concerning actions and significant issues taken and discussed.  Each Committee will consist of no fewer than three Directors. The Audit, Compensation, and Governance and Nominating Committees shall consist solely of independent Directors, as defined by the NYSE. In addition, Directors who serve on the Audit Committee must be independent within the meaning of the NYSE criteria for Audit Committee members. Committee members are appointed by the full Board upon the recommendations of the Governance and Nominating Committee. Committees may elect Committee Chairpersons, unless a Chairperson is designated by the Board. [Emphasis added].

## Audit Committee Charter

60.   The Company has an Audit Committee Charter published on its website, which outlines the responsibilities of the Audit Committee.  The Company's Audit Committee Charter states that it was approved by the Board of Directors on April 23, 2014.  On information and belief, Plaintiff alleges that this charter reflects and contains amendments to its earlier charter.  This information and belief is based on a review of the Company's 2013 Proxy Statement which states that the "Audit Committee operates pursuant to a written charter adopted by the Board."

61.   The Audit Committee Charter states in relevant part:

**Purpose**

The Audit Committee (the "Committee") is established by the Board of Directors (the "Board") of Lannett Company, Inc. (the "Company") for the purpose of assisting the Board's oversight of the:

Conformity, in all material respects, of the Company's financial statements filed with the SEC, with generally accepted accounting principles

- Company's systems of internal control over financial reporting
- ***Company's processes for monitoring compliance with legal and regulatory requirements***

- Independent Auditor's qualifications, compensation, performance, results and independence
- Performance and results of the Company's internal audit function
-

*   *   *

*Additional Responsibilities*

*   *   *

The Committee shall discuss the Company's policies with respect to risk assessment and risk management, including the risk of fraud. The Committee shall also discuss the Company's significant enterprise risks and the procedures Management has developed to monitor, manage and mitigate such exposures. [Emphasis added].

## Compensation Committee Charter

62.     The Company has a Compensation Committee Charter (dated January 23, 2019), published on its website, which outlines the responsibilities of the Compensation Committee. As stated in this charter, the purpose of the Compensation Committee includes:

- Establishing the Company's compensation philosophy which serves as the foundation for all policies and programs involving employee remuneration;
- Determining the CEO's compensation based on corporate goals and objectives;
- Advising the Board with respect to non-CEO executive officer compensation

## Governance and Nominating Committee Charter

63.     The Company has a Governance and Nominating Committee Charter (dated October 30, 2018), published on its website, which outlines the responsibilities of the Governance and Nominating Committee. As stated in this charter, the purpose of the Compensation Committee includes developing and recommending to the Board the corporate governance guidelines and reassessing the adequacy of these guidelines.

## Strategic Planning Committee Charter

20

64.     The Company has an Audit Committee Charter (dated January 20, 2015), published

on its website, which outlines the responsibilities of the Strategic Planning Committee. The

Strategic Planning Committee Charter states, in relevant part:

**Purpose**

The Strategic Planning Committee (the "Committee") is established by the Board
of Directors (the "Board") of Lannett Company, Inc. (the "Company") for the
purpose of assisting the Board in fulfilling its strategic planning duties such as:

- Overseeing the implementation of the strategic plan and related initiatives
- Identifying and evaluating corporate development opportunities
- Developing criteria for use in evaluating potential strategic investments
- Assisting management to identify critical strategic issues facing the
  organization
- Assessing potential mergers and acquisitions

\* \* \*

**Responsibilities**

In addition to other responsibilities which may be assigned from time to time by
the Board, the Committee is responsible for the following matters:

*Strategic Planning*

The Committee shall assist management in developing and refining a strategic plan
which identifies specific long-term goals and business objectives determined to be
in the Company's best interest. This includes helping management identify
opportunities such as mergers and acquisitions, joint ventures, new markets or
products lines, acquisition or disposition of capital assets, equity and debt funding
and modifications of existing capital structure, dividend policy, and stock offerings,
repurchase programs and reverse splits. Additionally, the Committee shall evaluate
the progress and effectiveness of the strategic plan, recommend changes to the plan
where necessary or advisable and evaluate other issues or opportunities.

## DUTIES OF THE DIRECTOR DEFENDANTS

65.     By reason of their positions as officers, directors, and/or fiduciaries of the Company

and because of their ability to control the business and corporate affairs of the Company, the

Director Defendants owed the Company and its shareholders the fiduciary obligations of trust,

loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

66.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

67.     The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

68.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating

truthful and accurate statements to the SEC and the investing public;

      (b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

      (d)     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

      (e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

      (f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

69.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

70.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the Securities Class Action (and related lawsuits).   As a result, the Company has expended, and will continue to expend, significant sums of money.

71.     The Director Defendants' actions have irreparably damaged the Company's corporate image and goodwill.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants caused the Company to conceal the true facts as alleged herein.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act; and (b) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls.

74.    Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of Defendants, who are, or were at relevant times, directors of the Company, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75.    Each of Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76.    At all times relevant hereto, each of Defendants was the agent of each of the other Defendants and of the Company and was at all times acting within the course and scope of such agency.

### SUBSTANTIVE ALLEGATIONS

### Background and the Lannett/JSP Relationship

77.    The Company develops, manufactures, packages, markets, and/or distributes solid oral (tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address a wide range of therapeutic areas.  The Company also produces, through its subsidiary, Cody Laboratories, Inc., active pharmaceutical ingredients.  The Company derives the

25

majority of its revenue from the sale of drugs that are bioequivalent to certain patented drugs once their patent expires (*i.e.*, generic drugs).  As such, the Company's manufacture and/or sale of its generic drugs constitute its "core operation".

78.     In fact, in its various annual reports filed with the SEC on Forms 10-K, the Company identifies its "Key Products" which since at least 2009 to the present has included four of the drugs that are part of the multiple antitrust lawsuits in some or each of those years; Levothyroxine, Digoxin, Ursodiol, and Acetazolamide.  As stated in its annual reports and as summarized below, from 2009 to 2015, Levo and Digoxin accounted for a majority of its net sales:

| Fiscal Year 2009 | Fiscal Year 2010 | Fiscal Year 2011 | Fiscal Year 2012 | Fiscal Year 2013 | Fiscal Year 2014 | Fiscal Year 2015 |
|---|---|---|---|---|---|---|
| 62% | 58% | 55% | 50% | 46% | 57% | 50% |

79.     Many of the Company's products are manufactured by others – primarily JSP – and distributed by the Company.  The Company's contract with JSP was one of the most critical, if not the most critical, contract that the Company had.  Purchases of finished goods inventory from JSP accounted for 37%, 36% and 52% of the Company's inventory purchases in fiscal years 2018, 2017 and 2016, respectively.  The Company reported that the value of products from the contract with JSP was $253 million in fiscal 2018, including $245.9 million from levothyroxine sodium tablets, up from the $174 million in total net revenue reported for levothyroxine sodium tablets in fiscal 2017.  Finished goods from JSP accounted for 37% of the Company's inventory purchases in fiscal year 2018, 36% in fiscal year 2017 and 52% in fiscal year 2016.

80.     Levothyroxine Sodium and Digoxin, both supplied by JSP, collectively accounted for 29% of the Company's total net sales in fiscal year 2017.  The Company's top-seller is Levothyroxine and the Company's gross margin on it is 60%.  Both Levothyroxine and Digoxin have a narrow therapeutic index, which means that under-dosing is ineffective, while overdosing

can be lethal. This leads consumers to be loyal to manufacturers once they find a dosage and formulation that works. This customer loyalty, in turn, makes demand more stable. Through JSP, the Company enjoyed up to a 14% market share of Digoxin throughout the duration of the JSP agreement, while enjoying a 10% market share of Levothyroxine. The Company's Levothyroxine net sales totaled $253.1 million, $187.0 million and $190.4 million in fiscal year 2018, 2017 and 2016, respectively, or 37%, 30% and 35% of total net sales, respectively, while net sales of Digoxin, also supplied by JSP, totaled $4.9 million and $9.5 million in fiscal years 2018 and 2017, respectively. Levothyroxine and Digoxin collectively accounted for 37% and 29% of the Company's total net sales in fiscal year 2018 and 2017, respectively.

81.    The JSP Agreement, first entered into on March 23, 2004, was negotiated by Defendant and former CEO Bedrosian, whereby JSP would make the formulation and stamp out the pill and the Company would just distribute the product. The terms of the agreement were in favor of the Company as it allowed the Company to greatly increase prices on Levothyroxine, while capping JSP at raising prices only 3% per year. During the contract, Bedrosian increased margins on Levothyroxine at 200% clips, thus generating increase margin for the Company while capping JSP's benefit. As part of the agreement, the Company issued JSP 4 million shares of the Company, which equated to approximately 17% of the outstanding shares at the time.

82.    Bedrosian had a close relationship with JSP, and despite the lop-sided terms of the JSP Agreement, Bedrosian was able to negotiate an extension of the initial contract. On August 19, 2013, the JSP Agreement was amended to continue for a five-year term with an expiration date of March 23, 2019. The extension of the initial contract allowed the Company to continue as the exclusive distributor in the United States of three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP; Digoxin Tablets USP; and Levothyroxine Sodium Tablets USP

As part of the Amendment, JSP was issued an additional 1.5 million shares, triggering the Company to record a $20.1 million expense in cost of sales, which represented the fair value of the shares on August 19, 2013.  If the parties were to agree to a second five-year extension from March 23, 2019 to March 23, 2024, the Company was required to issue to JSP or its designees an additional 1.5 million shares of the Company's common stock.  Maintaining the Company's share price was important to the Company for a number of traditional reasons, but more importantly, because a high share price would make renewing the Agreement more attractive to JSP.

83.     The only risk warning in the Company's periodic SEC filings related to JSP stated: "During the renewal term of the JSP Agreement, the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products.  There is no guarantee that the Company will be able to meet the minimum purchase requirements.  If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Distribution Agreement."  The risk factors made no mention of any risks related to JSP's failure to provide products nor of JSP failing to renew the contract.

84.     Bedrosian was eager to lead the Company to continued growth and success.  On November 27, 2015, the Company announced the acquisition of Kremers Urban Pharmaceuticals Inc.  This acquisition was very costly.  The acquisition was financed by a combination of proceeds of a recently completed $1.285 billion debt financing and cash on hand.  The Company entered into a $1.035 billion secured credit facility and issued $250 million of senior unsecured notes, the proceeds of which were used to fund the acquisition and related transaction costs.  The secured credit facility comprised a $910 million term loan facility and a $125 million revolving credit facility

85.     The Kremers Urban acquisition did not go as well as Bedrosian had planned, the

debt from the acquisition weighed heavily on the Company.  Between the time of the Company's deal to buy Kremers Urban until the announcement, Kremers Urban notified the Company that "a key customer has taken steps to transition its purchases of certain product lines."  Those product lines represented about $87 million of Kremers' $463 million in annual revenues for 2014.  In February 2016, the Company announced that it would cut 20% of the workforce to streamline operations, reduce costs, and adapt to the acquisition of Kremers Urban. The stock price fell following this announcement.  The workforce cuts were not enough, and Bedrosian soon began increasing the Company's drug prices precipitously.  Then, in October 2016, the Company's stock price plummeted further when the FDA announced its plan to withdraw approval of its generic treatment for attention deficit hyperactivity disorder.  The Company had acquired methylphenidate hydrochloride product, a bioequivalent of Concerta, during the purchase of Kremers Urban.

86.    The Company's Board had had enough of Bedrosian and the burdensome debt incurred during his leadership.  On September 25, 2017, the Company announced that Bedrosian would step down as soon as a new CEO was appointed.  Thus, after almost twelve (12) years of carefully helping the Company navigate the precarious and critical relationship with JSP, including extending the initial contract in August 2013, Bedrosian was pushed out.  On December 21, 2017 the Company announced that Defendant Crew would succeed Bedrosian on January 2, 2018.

87.    The Company, immediately recognizing that Bedrosian's departure might jeopardize the fragile relationship with JSP, stated in the February 8, 2018 Quarterly Earnings Call that Bedrosian would be remaining on in a "strategic advisory role of the company" and "will be focused on transitioning and strengthening our relationships with our key alliance partners of JSP." This was not enough, especially given the overhaul in core management that the new CEO, Defendant Crew performed in an effort to cut costs and onboard Crew's cronies from previous pharmaceutical

positions. The loss of Bedrosian's full leadership combined with Defendant Crew's new team and aggressive cost-cutting measures spelled the end for the JSP relationship. Bedrosian also realized that the JSP Agreement was doomed without his leadership, and thus sold approximately $2.5 million of his shares of the Company in November 2017.

88.     A number of former Company employees, including a director of Procurement, a SAP analyst, two Regional Sales Directors, and a National Sales Director, reaffirmed the importance of Bedrosian to the Company's relationship with JSP. These employees were not surprised when the Agreement was not renewed. One noted that "the relationship with JSP walked away when Arthur Bedrosian was asked to leave." Another employee, the National Sales Director, even noted that he thought that Bedrosian and Bedrosian's 'right hand man,' Kevin Smith, may have known the relationship with JSP was going to end and sold a lot of stock before the news came out in anticipation of the stock drop that would come when the news of JSP's non-extension was revealed to the public.

89.     As early as July 2014, JSP formed a partnership with Gemini Labs for Levothyroxine distribution. Gemini Labs distributes multiple forms of Levothyroxine. In May 2018, Amneal Pharmaceuticals acquired Gemini Laboratories.

**Background and Lannett's Antitrust Activities**

90.     Today, the generic pharmaceutical industry accounts for nearly 90% of all prescriptions written in the United States.

91.     As generic drugs enter the market, competition typically leads to dramatic reductions in price. Generic versions of brand name drugs are priced lower than the brand-name versions. Under most state laws, generic substitution occurs automatically, unless the prescriber indicates on the prescription that the branded drug must be "dispensed as written."

92.     Typically, as additional generic drug manufacturers enter a particular drug market, competition pushes the price down even further.  Frequently, the price of a generic drug will end up as low as 20% of the branded price or even lower, except when there are price-fixing arrangements between "competitors".

93.     In or around 2014, the DOJ began its investigation into the possibility of pricing collusion among makers of generic drugs.  Around the same time, the State of Connecticut began its investigation ("State AG investigation") into suspicious price increases for certain generic drugs.

94.     ██████████████████████████████████████████████████████████████ ████████████████████████████████████ And Defendants knew that the investigation related to one of its drugs, Digoxin, as it disclosed in its Form 10-K for the fiscal year ending June 30, 2014 and filed with the SEC on August 29, 2014 (the "2014 10-K"):

Connecticut Attorney General Inquiry

In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin.  According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.  The Company maintains that it acted in compliance with all applicable laws and regulations and intends to cooperate with the Connecticut Attorney General's investigation.

95.     Additionally, Defendants knew that the Company's success was due to price increases.  As stated in its 2014 10-K:

Product price increases contributed $157.3 million to the overall increase in net sales, partially offset by decreased volumes of $24.2 million.

* * *

Gross profit for the fiscal year ended June 30, 2014 increased 169% to $154.4 million or 56% of net sales.  In comparison, gross profit for the fiscal year ended June 30, 2013 was $57.4 million or 38% of net sales.  The gross profit percentage

change for the fiscal year ended June 30, 2014 was mainly attributable to changes in the mix of products sold and product price increases, as discussed above, offset by the charge related to the JSP contract renewal, which negatively impacted gross margin by 7 percentage-points.

96.    ████████████████████████████████████████████████

████████████████████████████████████  Defendants acknowledged

these investigations in its Form 10-K for the fiscal year ending June 30, 2015 and filed with the

SEC on August 27, 2015 (the "2015 10-K") in addition to and repeating the Connecticut Attorney

General Inquiry information (including its reference to Digoxin) contained in the 2014 10-K and

adding:

Federal Investigation into the Generic Pharmaceutical Industry

In fiscal year 2015, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.    The subpoenas request corporate documents of the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.

Based on reviews performed to date by outside counsel, the Company currently believes that it has acted in compliance with all applicable laws and regulations and continues to cooperate with the federal investigation.

97.    Though not specifically disclosed in 's 2015 10-K, Defendants knew or should have

known that one of its referenced "affiliated individuals [] served with a grand jury subpoena" was

Kevin Smith.

98.    Additionally, Defendants knew that the Company's continued success was due to

price increases.  As stated in its "2015 10-K:

Product price increases contributed $157.3 million to the overall increase in net sales, partially offset by decreased volumes of $24.2 million.

* * *

32

Gross profit for the fiscal year ended June 30, 2015 increased 98% to $306.4 million or 75% of net sales. In comparison, gross profit for the fiscal year ended June 30, 2014 was $154.4 million or 56% of net sales. The gross profit percentage change for the fiscal year ended June 30, 2015 was mainly attributable to product price increases. The remaining increase was due to the charge related to the JSP contract renewal, which negatively impacted gross margin percentage by 7 percentage points in Fiscal Year 2014.

99.　███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ In its Form 10-K for the fiscal year ending June 30, 2016 and filed with the SEC on August

29, 2016 (the "2016 10-K"), Defendants again acknowledged that in July 2014 it received

interrogatories and subpoena from the State of Connecticut Office of the Attorney General. In the

2016 10-K, Defendants also restated the 2015 10-K disclosure about the federal investigation into

the generic pharmaceutical industry. The Company's disclosure regarding the status of the State

AG matter repeated what was contained in its 2014 10-K and 2015 10-K, but added:

> In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the Department of Justice.

100.　On information and belief, based at least in part on the State AG investigation and

DOJ investigation, the Company did not continue with its pattern of price increase to bolster its

bottom line. As stated in its "2016 10-K:

> Gross profit, including the $23.6 million settlement agreement, decreased $19.9 million to $286.5 million, compared to the prior year period and gross profit percentage decreased to 53% compared to 75% in Fiscal 2015. Excluding the impact of KUPI and the settlement agreement, gross profit as a percentage of net sales decreased to 71%.

\* \* \*

Revenues from the KUPI acquisition of $165.6 million and increased volumes of

33

$38.7 million contributed to the overall increase in net sales, *partially offset by product price decreases* of $45.0 million. [Emphasis added].

101.    On December 14, 2016 and as a result of its investigation, the DOJ announced that two pharmaceutical executives, Jeffrey Glazer ("Glazer") and Jason Malek ("Malek"), were charged with price fixing, bid rigging, and customer allocation conspiracies related to glyburide, a drug that treats diabetes and doxycycline hyclate, an antibiotic.  It was later disclosed that Glazer and Malek are former executives of Heritage Pharmaceuticals Inc. ("Heritage").

102.    On or about January 10, 2017, Glazer and Malek pleaded guilty to price fixing charges related to the certain identified generic drugs.  Sentencing for Glazer and Malek is to occur in September 2019.

103.    ████████████████████████████████████████

████████████████████████████████████████████████

████████  Defendants acknowledged these investigations and the filing of the State AG Action in its Form 10-K for the fiscal year ending June 30, 2017 and filed with the SEC on August 28, 2017 (the "2017 10-K"):

*Connecticut Attorney General Inquiry*

In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into the pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.   In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the Department of Justice.  *In December 2016, the Connecticut Attorney General, joined by numerous other State Attorney General, filed a civil complaint* alleging that six pharmaceutical companies engaged in anti-competitive behavior related to Doxycycline Hyclate and Gliburide. *The Company was not named in the action and does not compete on the products that formed the basis of the complaint.*

34

The Company maintains that it acted in compliance with all applicable laws and regulations and continues to cooperate with the Connecticut Attorney General's investigation.

*Federal Investigation into the Generic Pharmaceutical Industry*

In fiscal years 2015 and 2016, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.

Based on reviews performed to date by outside counsel, the Company currently believes that it has acted in compliance with all applicable laws and regulations and continues to cooperate with the federal investigation. [Emphasis added].

104.    Defendants also were apprised of the status Private Antitrust, Consumer Protection Litigation, and Shareholder Litigation as disclosed in its 2017 10-K:

*Private Antitrust and Consumer Protection Litigation*

The Company and certain competitors have been named as defendants in a number of lawsuits filed in 2016 and 2017 alleging that the Company and certain generic pharmaceutical manufacturers have conspired to fix prices of generic digoxin, levothyroxine, ursodiol and baclofen. These cases are part of a larger group of more than 100 lawsuits generally alleging that approximately 50 generic pharmaceutical manufacturers and distributors conspired to fix prices for at least 18 different generic drugs in violation of the federal Sherman Act, various state antitrust laws, and various state consumer protection statutes. The United States also has been granted leave to intervene in the cases. On April 6, 2017, the Judicial Panel on Multidistrict Litigation ordered that all of the cases alleging price-fixing for generic drugs be consolidated for pretrial proceedings in the United States District Court for the Eastern District of Pennsylvania under the caption *In re: Generic Pharmaceuticals Pricing Antitrust Litigation*. The various plaintiffs are grouped into three categories — Direct Purchaser Plaintiffs, End Payer Plaintiffs, and Indirect Reseller Purchasers — and filed a Consolidated Amended Complaints against the Company and the other defendants on August 15, 2017. Originally, Plaintiffs filed a single lawsuit related to both doxycycline and digoxin naming the Company and other generic pharmaceutical manufacturers as defendants in the combined cases. However, when the multidistrict litigation was established with separate cases for each generic pharmaceutical at issue, the

Company was only named as a defendant in the digoxin cases, and not the doxycycline cases.

The Company believes that it acted in compliance with all applicable laws and regulations. Accordingly, the Company disputes the allegations set forth in these class actions. The Company does not believe that the ultimate resolution of these lawsuits will have a significant impact on our financial position, results of operations or cash flows.

*Shareholder Litigation*

In November 2016, a purported class action lawsuit was filed in the United States District Court for the Eastern District of Pennsylvania against the Company and two of its officers claiming that the Company in its securities filings made false and misleading statements in connection with its drug pricing methodologies and internal controls with respect to drug pricing methodologies, causing damage to the purported class. An amended complaint was filed in May 2017, and at this time the Company anticipates filing a motion to dismiss. The Company cannot reasonably predict the outcome of the suit at this time.

105. Defendants continued to remain apprised of developments in the State AG investigation and action which now sought to include the Company as a named defendant and the DOJ investigation as evidenced by its disclosures in the Company's Form 10-K for the fiscal year ending June 30, 2018 and filed with the SEC on August 28, 2018 (the "2018 10-K"), which stated in relevant part:

*Connecticut Attorney General Inquiry*

In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into the pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law. In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the Department of Justice. In December 2016, the Connecticut Attorney General, joined by numerous other State Attorneys General, filed a civil complaint alleging that six pharmaceutical companies engaged in anti-competitive behavior related to doxycycline hyclate and gliburide. The Company was not named in the action and does not compete on the products that formed the basis of the complaint. The

complaint was later transferred for pretrial purposes to the United States District Court for the Eastern District of Pennsylvania as part of a multidistrict litigation captioned In re: Generic Pharmaceuticals Pricing Antitrust Litigation. *On October 31, 2017, the state Attorneys General filed a motion in the District Court for leave to amend their complaint to add numerous additional defendants, including the Company, and claims relating to 13 additional drugs. The claim relating to Lannett involves alleged price-fixing for one drug, doxycycline monohydrate,* but does not involve the pricing for digoxin. *The state Attorneys General also allege that all defendants were part of an overarching, industry-wide conspiracy to allocate markets and fix prices generally.* The Court granted that motion on June 5, 2018. The state Attorneys General filed their amended complaint on June 15, 2018. None of the defendants, including the Company, has responded yet to the amended complaint.

The Company maintains that it acted in compliance with all applicable laws and regulations and continues to cooperate with the Connecticut Attorney General investigation.

### Federal Investigation into the Generic Pharmaceutical Industry

The Company and certain affiliated individuals and customers have been served with grand jury subpoenas relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.

*The Company received a Civil Investigative Demand ("CID") from the Department of Justice on May 14, 2018. The CID requests information regarding allegations that the generic pharmaceutical industry engaged in market allocation, price fixing, payment of illegal remuneration and submission of false claims. The CID requests information from 2009-present*. The Company is in the process of responding to the CID.

Based on reviews performed to date by outside counsel, the Company currently believes that it has acted in compliance with all applicable laws and regulations and continues to cooperate with the federal investigation. [Emphasis added].

106.   Defendants also were apprised of the status Private Antitrust, Consumer Protection

Litigation, and Shareholder Litigation as disclosed in its 2018 10-K:

### Private Antitrust and Consumer Protection Litigation

The Company and certain competitors have been named as defendants in a number of lawsuits filed in 2016 and 2017 alleging that the Company and certain generic pharmaceutical manufacturers have conspired to fix prices of generic digoxin, levothyroxine, ursodiol and baclofen. These cases are part of a larger group of more than 100 lawsuits generally alleging that over 30 generic pharmaceutical manufacturers and distributors conspired to fix prices for at least 18 different generic drugs in violation of the federal Sherman Act, various state antitrust laws, and various state consumer protection statutes. The United States also has been granted leave to intervene in the cases. On April 6, 2017, the Judicial Panel on Multidistrict Litigation (the "JPML") ordered that all of the cases alleging price-fixing for generic drugs be consolidated for pretrial proceedings in the United States District Court for the Eastern District of Pennsylvania under the caption In re: Generic Pharmaceuticals Pricing Antitrust Litigation. The various plaintiffs are grouped into three categories — Direct Purchaser Plaintiffs, End Payer Plaintiffs, and Indirect Reseller Purchasers — and filed Consolidated Amended Complaints ("CACs") against the Company and the other defendants on August 15, 2017.

The CACs naming the Company as a defendant involve generic digoxin, levothyroxine, ursodiol and baclofen. Pursuant to a court-ordered schedule grouping the 18 different drug cases into three separate tranches, the Company and other generic pharmaceutical manufacturer defendants on October 6, 2017 filed joint and individual motions to dismiss the CACs involving the six drugs in the first tranche, including digoxin. Those motions are pending.

On January 22, 2018, three opt-out direct purchasers filed a complaint alleging an overarching conspiracy and individual conspiracies on behalf of the Company and numerous other defendants to fix the prices of and allocate markets for at least 30 different drugs, including digoxin, doxycycline, levothyroxine, ursodiol and baclofen. On August 3, 2018, another opt-out direct purchaser filed a complaint alleging an overarching conspiracy and individual conspiracies on behalf of the Company and numerous other defendants to fix the prices of and allocate markets for 16 different drugs, including digoxin, doxycycline, levothyroxine, ursodiol and baclofen. None of the defendants, including the Company, has responded yet to the opt-out complaints.

In addition to the lawsuits brought by private plaintiffs, the Attorneys General of 45 states, the District of Columbia and Puerto Rico have filed parens patriae lawsuits alleging price-fixing conspiracies by various generic pharmaceutical manufacturers. The JPML has consolidated the suits by the state Attorneys General in the Eastern District of Pennsylvania as part of the multidistrict litigation. The original lawsuits did not name the Company, but the state Attorneys General on October 31, 2017 filed a motion with the District Court for leave to amend their complaint to add numerous additional defendants, including the Company, and claims relating to 13 additional drugs. The claim relating to Lannett involves alleged price-fixing for one drug, doxycycline monohydrate, although the state Attorneys General allege that all defendants were part of an overarching, industry-

wide conspiracy to allocate markets and fix prices generally. The Court granted that motion on June 5, 2018. The state Attorneys General filed their amended complaint on June 15, 2018. None of the defendants, including the Company, has responded yet to the amended complaint.

Following the lead of the state Attorneys General, the Direct Purchaser Plaintiffs, End Payer Plaintiffs and Indirect Reseller Plaintiffs have filed their own complaints also alleging an overarching conspiracy, making similar allegations to those contained in the state Attorneys General complaint, relating to 14 generic drugs in the End Payer complaint and 15 generic drugs in the Indirect Reseller complaint. The End Payer Plaintiffs filed their complaint on June 7, 2018, the Indirect Reseller Plaintiffs filed their complaint on June 18, 2018, and the Direct Purchaser Plaintiffs filed their complaint on June 22, 2018. Although the complaints allege an overarching conspiracy with respect to all of the drugs identified, the specific allegations related to drugs Lannett makes involve acetazolamide and doxycycline monohydrate. None of the defendants, including the Company, has responded yet to these complaints.

The Company believes that it acted in compliance with all applicable laws and regulations. Accordingly, the Company disputes the allegations set forth in these class actions.

*Shareholder Litigation*

In November 2016, a putative class action lawsuit was filed against the Company and two of its officers claiming that the Company damaged the purported class by including in its securities filings false and misleading statements regarding the Company's drug pricing methodologies and internal controls. An amended complaint was filed in May 2017, and the Company filed a motion to dismiss the amended complaint in September 2017. In December 2017, counsel for the putative class filed a second amended complaint, and the Court denied as moot the Company's motion to dismiss the first amended complaint. The Company filed a motion to dismiss the second amended complaint in February 2018. In July 2018, the court granted the Company's motion to dismiss the second amended complaint and granted the putative lead plaintiffs twenty-one days to file an amended complaint. The Company cannot reasonably predict the outcome of the suit at this time.

In July 2018, a shareholder derivative complaint was filed against the Company and certain of its current and former directors and executives in the United States District Court for the Eastern District of Pennsylvania. The derivative complaint alleges that the Company engaged in an illegal conspiracy to fix generic drug prices and that the Company's directors and executives violated their fiduciary duties by allowing the Company to violate the applicable laws and regulations and failing to take any action to curtail management's deliberate price-fixing scheme. The derivative complaint includes causes of action for violation of Section 10(b) of the

Exchange Act, violation of Section 14(a) of the Exchange Act, violation of Section 29(a) of the Exchange Act, and for breach of fiduciary duty. The Company cannot reasonably predict the outcome of the suit at this time.

107.   On May 31, 2019 and as a result of its investigation, the DOJ announced that Heritage was charged for conspiring with its competitors to fix prices, rig bids, and allocate customers for glyburide. On that date Heritage entered into a deferred prosecution agreement resolving the charge, under which Heritage admitted that it conspired to fix prices, rig bids, and allocate customers for glyburide. Pursuant to the agreement, Heritage will pay a criminal penalty and cooperate fully with the ongoing criminal investigation.

108.   Defendants continued to remain apprised of developments in the State AG investigation and action, which now included the Company as a named defendant and the DOJ investigation as evidenced by its disclosures in the Company's Form 10-K for the fiscal year ending June 30, 2019 and filed with the SEC on August 28, 2019 (the "2019 10-K"), which stated in relevant part:

> _State Attorneys General Inquiry into the Generic Pharmaceutical Industry_
>
> In July 2014, the Company received interrogatories and a subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into the pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law. In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the Department of Justice pursuant to the federal investigation described below. _**In December 2016, the Connecticut Attorney General, joined by numerous other State Attorneys General, filed a civil complaint alleging that six pharmaceutical companies engaged in anti-competitive behavior. The Company was not named in the action and does not compete on the products that formed the basis of the complaint.**_ The complaint was later transferred for pretrial purposes to the United States District Court for the Eastern District of Pennsylvania as part of a multidistrict litigation captioned In re: Generic Pharmaceuticals Pricing Antitrust Litigation. On October 31, 2017, the State Attorneys General filed a motion in the District Court for leave

to amend their complaint to add numerous additional defendants, including the Company, and claims relating to 13 additional drugs.  The Court granted that motion on June 5, 2018.  *The State Attorneys General filed their amended complaint on June 18, 2018. The claim relating to Lannett involves alleged price-fixing for one drug, doxycycline monohydrate,* but does not involve the pricing for digoxin. *The State Attorneys General also allege that all defendants were part of an overarching, industry-wide conspiracy to allocate markets and fix prices generally.  On August 15, 2019, the Court denied the defendants' joint motion to dismiss the overarching conspiracy claims,* but has yet to decide an individual motion filed by the Company to dismiss the overreaching conspiracy claims as to it.

*On May 10, 2019, the State Attorneys General filed a new lawsuit naming the Company, and one of its employees as defendants, along with 33 other corporations and individuals.* The new complaint again alleges an overarching conspiracy and contains claims for price fixing and market allocation under the Sherman Act. The complaint focuses on the conduct of another generic pharmaceutical company, and the relationships that company had with other generic companies and their employees. *The specific allegations in the new complaint against Lannett relate to the Company's sales of baclofen and levothyroxine. The new complaint also names another current employee as a defendant, however the allegations pertain to conduct that occurred prior to their employment by Lannett.* The Company has not responded to the new complaint as of the date of this report.

Based on internal investigations performed to date, the Company currently believes that it has acted in compliance with all applicable laws and regulations.

*Federal Investigation into the Generic Pharmaceutical Industry*

In November and December 2014, the Company and certain affiliated individuals and customers were served with grand jury subpoenas relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoenas request corporate documents of the Company relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.

*The Company received a Civil Investigative Demand ("CID") from the Department of Justice on May 14, 2018.  The CID requests information regarding allegations that the generic pharmaceutical industry engaged in market allocation, price fixing, payment of illegal remuneration and submission of false claims*.  The CID requests information from 2009-present. The Company is in the process of responding to the CID.

Based on internal investigations performed to date, the Company believes that it has acted in compliance with all applicable laws and regulations.   [Emphasis added].

109.    The Company's 2019 10-K also provided information regarding other litigation matters including Private Antitrust and Consumer Protection Litigation and Shareholder Litigation, stating in relevant part:

*Private Antitrust and Consumer Protection Litigation*

***The Company and certain competitors have been named as defendants in a number of lawsuits filed in 2016 and 2017 alleging that the Company and certain generic pharmaceutical manufacturers have conspired to fix prices of generic digoxin, levothyroxine, ursodiol and baclofen.*** These cases are part of a larger group of more than 100 lawsuits generally alleging that over 30 generic pharmaceutical manufacturers and distributors conspired to fix prices for at least 18 different generic drugs in violation of the federal Sherman Act, various state antitrust laws, and various state consumer protection statutes.  The United States also has been granted leave to intervene in the cases.  ***On April 6, 2017, the Judicial Panel on Multidistrict Litigation (the "JPML") ordered that all of the cases alleging price-fixing for generic drugs be consolidated for pretrial proceedings in the United States District Court for the Eastern District of Pennsylvania under the caption In re: Generic Pharmaceuticals Pricing Antitrust Litigation.***  The various plaintiffs are grouped into three categories — Direct Purchaser Plaintiffs, End Payer Plaintiffs, and Indirect Reseller Purchasers — and filed Consolidated Amended Complaints ("CACs") against the Company and the other defendants on August 15, 2017.

***The CACs naming the Company as a defendant involve generic digoxin, levothyroxine, ursodiol and baclofen.***  Pursuant to a court-ordered schedule grouping the 18 different drug cases into three separate tranches, the Company and other generic pharmaceutical manufacturer defendants on October 6, 2017 filed joint and individual motions to dismiss the CACs involving the six drugs in the first tranche, including digoxin. ***On October 16, 2018, the Court (with one exception) denied defendants' motions to dismiss plaintiffs' Sherman Act claims with respect to the drugs in the first tranche.*** On March 15, 2019, the Company and other defendants filed answers to the Sherman Act claims. In addition, ***on February 15, 2019, the Court granted defendants' motions to dismiss certain of the plaintiffs' state law claims*** brought under the laws of Illinois, Rhode Island, Georgia, South Carolina, Montana, West Virginia, Alabama, New Jersey, Michigan and Nevada, but denied the remainder of defendants' motions to dismiss. The Court set a deadline of April 1, 2019 for certain plaintiffs to amend their existing complaints to reflect the rulings set forth in the Court's February 15, 2019 ruling on the state law motions to dismiss. ***Those plaintiffs amended their complaints,***

*but further motions to dismiss the state-law claims have been deferred until the Court decides pending motions to dismiss with respect to the plaintiffs' various overarching-conspiracy claims.*

*On January 22, 2018, three opt-out direct purchasers filed a complaint alleging an overarching conspiracy and individual conspiracies against the Company and numerous other defendants* to fix the prices of and allocate markets for at least 30 different drugs, including digoxin, doxycycline, levothyroxine, ursodiol and baclofen. On August 3, 2018, another opt-out direct purchaser filed a complaint alleging an overarching conspiracy and individual conspiracies against the Company and numerous other defendants to fix the prices of and allocate markets for 16 different drugs, including digoxin, doxycycline, levothyroxine, ursodiol and baclofen. *On February 21, 2019, the Company and the other defendants filed motions to dismiss the overarching conspiracy claims. On August 15, 2019, the Court denied the defendants' joint motion to dismiss the overarching conspiracy claims, but has yet to decide an individual motion filed by the Company to dismiss the overarching conspiracy claims as to it.* On January 16, 2019, another opt-out direct purchaser filed a complaint alleging an overarching conspiracy and individual conspiracies on behalf of the Company and numerous other defendants to fix the prices of and allocate markets for the 30 different, including digoxin, doxycycline, levothyroxine, ursodiol, baclofen and acetazolamide. None of the defendants, including the Company, has responded yet to this particular complaint. On July 29, 2019, a group of insurance company opt-out plaintiffs commenced an action against the Company and numerous other defendants by filing a writ of summons in the Court of Common Pleas of Philadelphia County, Pennsylvania, but have yet to file a complaint.

In addition to the lawsuits brought by private plaintiffs, the Attorneys General of 48 states, the District of Columbia and Puerto Rico have filed parens patriae lawsuits alleging price-fixing conspiracies by various generic pharmaceutical manufacturers. *The JPML has consolidated the suits by the state Attorneys General in the Eastern District of Pennsylvania as part of the multidistrict litigation. The original lawsuits did not name the Company, but the state Attorneys General filed an amended complaint on June 18, 2018 to add numerous additional defendants, including the Company, and claims relating to 13 additional drugs. The claim relating to the Company involves alleged price-fixing for one drug, doxycycline monohydrate, although the state Attorneys General allege that all defendants were part of an overarching, industry-wide conspiracy to allocate markets and fix prices generally. On February 21, 2019, the Company and the other defendants filed motions to dismiss the overarching conspiracy claims. On August 15, 2019, the Court denied the defendants' joint motion to dismiss the overarching conspiracy claims, but has yet to decide an individual motion filed by the Company to dismiss the overarching conspiracy claims as to it.* Additionally, *on May 5, 2019, the state Attorneys General filed a new complaint in Connecticut alleging price-fixing conspiracies by the Company and various generic pharmaceutical manufacturers and individuals relating to*

*more than 40 additional drugs. The complaint has since been added to the multidistrict litigation in the Eastern District of Pennsylvania. The additional claims relating to the Company involve baclofen and levothyroxine*, although the state Attorneys General allege that all defendants were part of an overarching, industry-wide conspiracy to allocate markets and fix prices generally. None of the defendants, including the Company, has responded yet to this particular complaint.

Following the lead of the state Attorneys General, the Direct Purchaser Plaintiffs, End Payer Plaintiffs and Indirect Reseller Plaintiffs have filed their own complaints also alleging an overarching conspiracy, making similar allegations to those contained in the state Attorneys General complaint, relating to 14 generic drugs in the End Payer complaint and 15 generic drugs in the Indirect Reseller complaint. The End Payer Plaintiffs filed their complaint on June 7, 2018, the Indirect Reseller Plaintiffs filed their complaint on June 18, 2018, and the Direct Purchaser Plaintiffs filed their complaint on June 22, 2018. Although the complaints allege an overarching conspiracy with respect to all of the drugs identified, the specific allegations related to drugs Lannett manufactures involve acetazolamide and doxycycline monohydrate. On February 21, 2019, the Company and the other defendants filed motions to dismiss the overarching conspiracy claims. On August 15, 2019, the Court denied the defendants' joint motion to dismiss the overarching conspiracy claims, but has yet to decide an individual motion filed by the Company to dismiss the overarching conspiracy claims as to it.

On September 25, 2018, two other alleged direct purchasers filed a purported class action complaint alleging an overreaching, industry-wide horizontal and vertical conspiracy involving the company, numerous other generic pharmaceutical manufacturers, and various pharmaceutical distributors to allocate markets and fix prices generally for a variety of generic drugs. The case has been added to the multidistrict litigation. On December 21, 2018, the plaintiffs filed an amended complaint. On February 21, 2019, the Company and the other defendants filed motions to dismiss the overarching conspiracy claims. On August 15, 2019, the Court denied the defendants' joint motion to dismiss the overarching conspiracy claims, but has yet to decide an individual motion filed by the Company to dismiss the overarching conspiracy claims as to it.

The Company believes that it acted in compliance with all applicable laws and regulations. Accordingly, the Company disputes the allegations set forth in these class actions and plans to vigorously defend itself from these claims.

*Shareholder Litigation*

In November 2016, a putative class action lawsuit was filed against the Company and two of its officers in the federal court for the Eastern District of Pennsylvania, alleging that the Company damaged the purported class by including in its securities filings false and misleading statements regarding the Company's drug pricing methodologies and internal controls. An amended complaint was filed in

May 2017, and the Company filed a motion to dismiss the amended complaint in September 2017. In December 2017, counsel for the putative class filed a second amended complaint, and the Court denied as moot the Company's motion to dismiss the first amended complaint. The Company filed a motion to dismiss the second amended complaint in February 2018. In July 2018, the court granted the Company's motion to dismiss the second amended complaint. *In September 2018, counsel for the putative class filed a third amended complaint. The Company filed a motion to dismiss the third amended complaint in November 2018. In May 2019, the court denied the Company's motion to dismiss the third amended complaint*. In July 2019, the Company filed an answer to the third amended complaint. The Company believes it acted in compliance with all applicable laws and plans to vigorously defend itself from these claims. The Company cannot reasonably predict the outcome of the suit at this time.

*In October 2018, a putative class action lawsuit was filed* against the Company and two of its officers in the federal court for the Eastern District of Pennsylvania, *alleging* that the Company, its Chief Executive Officer and its Chief Financial Officer damaged the purported class by *making false and misleading statements in connection with the possible renewal of the JSP Distribution Agreement*. In December 2018, counsel for the putative class filed an amended complaint. The Company moved to dismiss the amended complaint in January 2019. *In March 2019, the Court granted in part and denied in part the Company's motion to dismiss*. In May 2019, the Company filed an answer to the amended complaint. *During May and June 2019, the parties negotiated a proposed settlement and agreed to settle the litigation, by which the Company agreed to pay the sum of $300,000 without an admission of liability* and subject to the negotiation of the terms of a stipulation of settlement and approval by the Court. In July 2019, counsel for the putative class filed a motion for preliminary approval of the proposed settlement and on July 31, 2019, the Court issued an Order granting the motion and scheduling a hearing for final approval of the settlement for February 7, 2020.

In December 2018, the Chairman of the Company's Board of Directors received a letter sent on behalf of two purported shareholders demanding that the Company's Board of Directors investigate and commence legal proceedings against certain former and/or current directors, officers, and agents of the Company relating to alleged breaches of fiduciary duties, corporate waste, and unjust enrichment. In January 2019, the Company's Board of Directors formed a special committee to investigate the allegations made in the demand letter. The special committee retained independent counsel to assist it in connection with its investigation, which is ongoing. At this time the Company cannot reasonably predict what outcome, if any, will follow from the Company and the Company's Board of Director's receipt of the demand letter and ongoing internal investigation.

In May 2019, a shareholder derivative lawsuit was filed against certain of the Company's current and former officers and certain of the current and former members of the Company's Board of Directors in the federal court for the District

of Delaware. The Company was also named as a nominal defendant in the suit. The suit alleges that the defendants breached their fiduciary duties as directors and/or officers of the Company, that certain of the defendants caused the Company to issue false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934, that the defendants were unjustly enriched at the expense of the Company, and that the defendants wasted corporate assets belonging to the Company. The Company cannot reasonably predict the outcome of the suit at this time.

In June 2019, the Chairman of the Company's Board of Directors received letters sent on behalf of a purported shareholder demanding to inspect certain of the Company's books and records. The purported shareholder sought to access the books and records in question in order to investigate alleged potential wrongdoing, alleged mismanagement, and alleged breaches of fiduciary duties by members of the Company's management and Board of Directors relating to the Company's alleged participation in a conspiracy to fix prices, allocate markets, and rig bids for a number of generic pharmaceuticals. In July 2019, the Company agreed to make available to the purported shareholders certain documents demanded in the June 2019 inspection demand letters. In July 2019, counsel to the purported shareholders indicated that the purported shareholders may file a shareholder derivative suit against certain of the Company's current and former executives and officers and certain of the current and former members of the Company's Board of Directors; the Company may also be named as a nominal defendant in such a suit. At this time the Company cannot reasonably predict what outcome, if any, will follow from the Company and the Company's Board of Director's receipt of the inspection demand letters. [Emphasis added].

**The Antitrust Overarching Conspiracy**

110.    In 2014 and around the same time as the DOJ investigation, the State of Connecticut

began its investigation ("State AG investigation") into suspicious price increases for certain generic

drugs. In December 2016, the CTAG, with other state attorneys general, filed a complaint alleging

that named generic pharmaceutical manufacturers (not including the Company at this time)

participated in a price fixing scheme related to certain identified drugs. On June 18, 2018, the

CTAG filed an amended complaint which added the Company as a defendant and also added

additional drugs that were part of this scheme. This complaint focused on two theories of wrongful

behavior: (a) market allocation agreements (the "Overarching Conspiracy"), and (b) price fixing

related to specific drugs. On August 15, 2019, the Court denied the defendants' joint motion to

dismiss the Overarching Conspiracy claims but has not yet decided the Company's individual motion to dismiss the Overarching Conspiracy claims as to it.

111.    On May 10, 2019, the State Attorneys General filed a new lawsuit (the "State AG Action 2") against the Company and two of its current employees as defendants (Maureen Cavanaugh (though not relating to her conduct while employed by the Company) and Tracy Sullivan), along with other corporations and individuals. The new complaint alleges an overarching conspiracy and contains claims for price fixing, and as to the Company relates to its sales of Baclofen and Levothyroxine.

112.    Regarding the Overarching Conspiracy, the State AG Action 2 generally describes the generic pharmaceutical industry and its mutation from "fair-sharing" to co-conspiracy:

> For many years, the generic pharmaceutical industry has operated pursuant to an understanding among generic manufacturers not to compete with each other and to instead settle for what these competitors refer to as "fair share." This understanding has permeated every segment of the industry, and the purpose of the agreement was to avoid competition among generic manufacturers that would normally result in significant price erosion and great savings to the ultimate consumer. Rather than enter a particular generic drug market by competing on price in order to gain market share, competitors in the generic drug industry would systematically and routinely communicate with one another directly, divvy up customers to create an artificial equilibrium in the market, and then maintain anticompetitively high prices. This "fair share" understanding was not the result of independent decision making by individual companies to avoid competing with one another. Rather, it was a direct result of specific discussion, negotiation and collusion among industry participants over the course of many years.

> By 2012, Teva and its competitors sought to leverage the collusive nature of the industry to not only maintain their "fair share" of each generic drug market, but also to significantly raise prices on as many drugs as possible.

> At the zenith of this collusive activity involving Teva, during a 19-month period beginning in July 2013 and continuing through January 2015, Teva significantly raised prices on approximately 112 different generic drugs. Of those 112 different drugs, Teva colluded with its "High Quality" competitors on at least 86 of them (the others were largely in markets where Teva was exclusive). The size of the price increases varied, but a number of them were well over 1,000%.

113.   The State AG Action 2 also discusses and identifies the various events and methods used by the Company and other defendants to execute their overarching conspiracy and price fixing schemes (at ¶¶ 101-113), including trade association events (including the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), customer conferences, industry dinners (some referred to as "Girls Night Out/GNO" or "Women in the Industry") and private meetings.

114.   The State AG Action describes the Overarching Conspiracy at ¶ 115 and as follows:

> The overarching conspiracy among generic manufacturers, however – which ties together all of the agreements on individual drugs identified in this Complaint – is an agreed upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. Coined "fair share," the term is generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry. Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business.  The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion and serve as the basis for further supra-competitive price increases.

### THE COMPANY AND ITS DRUGS AT ISSUE

**Baclofen**

115.   The State AG Action 2 details the Company's participation in the Overarching Conspiracy relating to allocation of market share for the drug Baclofen.  As recounted in the State AG Action:

> Baclofen, also known by the brand names Gablofen and Lioresal, is a muscle relaxant used to treat muscle spasms caused by certain conditions such as multiple sclerosis and spinal cord injury or disease.  It is generally regarded as the first choice of physicians for the treatment of muscle spasms in patients with multiple sclerosis.

> In June 2014, Defendant Lwas preparing to re-enter the market for Baclofen but was faced with limited supply.  In an internal e-mail sent to his sales staff, K.S., a senior sales executive at Lannett, stated: "Baclofen launch in four weeks, need market

intelligence. We can only take a 10% market share." At that time, Teva had a large market share in relation to the existing competitors in the market.

Defendant Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail, promptly communicated with Defendant Patel (Teva was a competitor for Baclofen) using Facebook Messenger. On June 12, 2014, Sullivan messaged Patel, stating:



The message was sent at 11:16am. At 11:30am, Defendant Patel called Defendant Sullivan and they spoke for seven (7) minutes. This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013. During the conversation, Defendant Sullivan informed Defendant Patel that Lannett would be entering the market for Baclofen shortly. In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



True to her word, Defendant Sullivan called Defendant Patel on July 1, 2014 and left a voicemail. Patel promptly returned the call, and the two spoke for almost seven (7) minutes.

On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague: "[n]ot sure if it helps your review, but there is another entrant coming to market (Lannett). I'm not sure about their share targets, but I know it's probably

soon." That same day, Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back promptly, and they spoke for more than three (3) minutes. After speaking, Patel sent another text message to Sullivan, stating: "Thank you!!" Sullivan responded: "No prob!"

Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (*i.e.*, offer a lower price to maintain the account). Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid. Defendant Patel specifically agreed with the decision to concede, stating "I believe this is Lannett." Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant."

Teva had significantly increased its price for Baclofen in April 2014 (following an Upsher-Smith price increase) and was able to maintain those prices even after Lannett entered the market a few months later. In fact, when Lannett entered the market it came in at the exact same WAC price as Teva.

116.   On information and belief, Plaintiffs allege that the reference to "K.S." in the State AG Action 2 (and described as ". . . a senior sales executive at the Company) refers to Keven Smith who joined the Company in 2002 as its Vice President of Sales and Marketing, and ultimately was promoted to the position of Senior Vice President of Sales and Marketing.

**Levothyroxine**

117.   In addition to the Company participating in the overarching conspiracy, it also participated in a price fixing scheme related to (at a minimum) its drug, Levothyroxine (which is also at the center of the JSP Agreement). The Company has listed Levothyroxine as one of its Key Products in all its Form 10-Ks since at least 2009. Evidence of this scheme is recounted in the State AG Action 2:

Levothyroxine is a synthetic form of the thyroid hormone thyroxine used to treat hypothyroidism, goiter, thyroid cancer, and cretinism.

Levothyroxine was the second most prescribed drug, measured by number of prescriptions, in the United States in the first quarter of 2010. Over 120 million prescriptions are written annually for Levothyroxine in the United States, treating

15% of the population over the age of 55.

Since approximately December 2010, Defendants Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine. Defendant Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz. In addition to communicating directly with CW-4 on this drug, Defendant Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Defendant Green of Teva. Notably, Levothyroxine was not a drug that Teva sold.

As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine. The day before the Mylan increase, on January 3, 2013, Defendant Nesta of Mylan and Defendant Green of Teva spoke at least four times by phone. The next morning – the day of the Mylan price increases – Defendant Green spoke twice with Defendant Kellum, including a six (6) minute call at 9:34am.

Shortly after hanging up the phone with Defendant Green, Defendant Kellum sent an internal e-mail stating, among other things, that he "[j]ust heard from a customer that . . . Mylan took a significant price increase on Levothyroxine" and Defendant Kellum advised his team to "please be cautious" on this product. As the phone records demonstrate, Defendant Kellum's source for the information was not "a customer," but rather Defendant Green of Teva.

That same morning, K.S. of Lannett called Defendant Nesta of Mylan. The phone call lasted 44 seconds. Then, on January 10, 2013, Defendant Nesta called K.S. back and they spoke for more than six (6) minutes. That same day, McKesson e-mailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally, "This is a no. We just learned that Mylan took a large price increase."

The following Monday – January 14, 2013 – Lannett raised its WAC pricing for Levothyroxine to match Mylan. Notably, after these phone calls, Defendant Nesta would not speak again with K.S. of Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.

On July 16, 2013 – as detailed above – CW-4 spoke with Defendant Nesta and sent the July 2013 E-mail identifying the Mylan price increases. The price list included Levothyroxine and noted that Lannett had followed.

On August 6, 2013, Defendant Nesta called CW-4 two times. Both calls lasted less than a minute. A few minutes after the second call, Defendant Nesta called K.S. at Lannett. The call lasted 24 seconds (likely a voicemail). Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail that stated: "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to S.G.'s e-mail stating, "This is correct based on my info as well."

Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

On August 14, 2013, S.G. sent an e-mail to Defendant Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded: "[w]orking on it." In response, S.G. replied: "Thx. I believe Lannett rationalized the market earlier this week." CW-1 answered "We just noticed that as well."

On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. J.M., a national account manager at Lannett, forwarded the request to K.S. stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to us ...." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

During a September 10, 2013 earnings call, Lannett's CEO, A.B., was asked for his reaction to Mylan's Levothyroxine price increase. A.B. responded, "You mean after I sent them a thank you note? I'm just kidding. . . . I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well. . . . So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

The three competitors – Defendants Mylan, Lannett, and Sandoz – did not stop there. They coordinated again to raise price on Levothyroxine in April/May 2014.

Consistent with the 2013 increases, Mylan was first to raise its WAC pricing on Levothyroxine on April 25, 2014. In the two days leading up to the increase, Defendant Nesta and K.S. of Lannett spoke by phone several times. These calls are listed below. Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

On April 25, 2014 – the day that Mylan increased its price of Levothyroxine – P.C., a sourcing manager at Cardinal Health, sent a text to Defendant Sullivan of Lannett stating: "[n]ot sure if you knew already . . . Mylan increasing levos." Defendant Sullivan responded: "Thanks for the heads up… We heard 55% on contract price, can you confirm?" P.C. replied, "[y]es ~50-55%." Defendant Sullivan had "heard" about the Mylan increase from her supervisor, K.S., who had communicated with Defendant Nesta only days prior.

Lannett quickly followed with a price increase of its own – raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

118. On information and belief, Plaintiffs allege that the reference to "K.S." in this section of the State AG Action 2 (and described as ". . . a senior sales executive at the Company) refers to Keven Smith who joined the Company in 2002 as its Vice President of Sales and Marketing, and ultimately was promoted to the position of Senior Vice President of Sales and Marketing. The reference to "Defendant Sullivan" in this section of the State AG Action refers to Tracy Sullivan, who has been employed at the Company since 2007 and is currently the Company's Director of National Accounts.

**Digoxin**

119. The Company has listed Digoxin as one of its Key Products in all its Form 10-Ks since at least 2009. On August 15, 2017, the Company and other generic drug manufacturers were named as defendants in a Direct Purchaser Class Action Complaint relating to its drug Digoxin in that action commonly known as *Ahold USA Inc., et al. v. Impax Laboratories, Inc., et al.*, Direct Case No. 16-DG-27241 (E.D. PA) (the "Digoxin Class Action"), which was transferred to and made a part of the multi-district litigation *In re: Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-

02724-CMR (E.D. Pa.) (the "Antitrust Action").  In addition to the allegations in the Digoxin Class

Action, the Company's wrongful conduct relating to Digoxin is detailed in the Securities Class

Action and recounted as follows:

> Digoxin is used to treat heart failure and chronic atrial fibrillation. The drug is used primarily by elderly patients for the treatment of rapid rhythm disturbance. The World Health Organization has classified Digoxin as an essential medicine. No effective substitute exists for many patients, and none of the comparable molecules or therapeutic equivalents are prescribed in any significant volume. Millions of people in the U.S. rely on the pill every day. During 2013, the overall market for Digoxin was $198 million. Sales by Global Pharma, which is the generics division of Impax, and Lannett represented a substantial portion of the generic market.

> Prior to the Class Period, in 2004, Lannett entered into a contract with Jerome Stevens Pharmaceuticals ("JSP") to be the distributor of Digoxin produced by JSP (along with two other of JSP products, including Levothyroxine) until March 2014. On August 19, 2013, Lannett announced that it had extended its contract with JSP to distribute Digoxin and Levothyroxine (as well as another drug, Butalbital) in the United States until March 2024.  The JSP contract accounted for a substantial amount of Lannett's gross profit.  For example, in 2013, just two of JSP's drugs, Levothyroxine and Digoxin, accounted for 46% of Lannett's sales.

> Figure 1 below breaks down the total market for Digoxin by percentage of total sales. Figure 1 clearly illustrates that the total sales of generic Digoxin were concentrated among Lannett, and Global Pharma/Impax during the Class Period with Par Pharmaceutical ("Par") beginning to enter the market later in the Class Period.  Figure 1.1 further breaks down the generic Digoxin market share for the years of 2013 and 2014.

> The Wholesale Acquisition Cost ("WAC") [referenced in Figure 1] is the manufacturers reported list price of the drug when sold to the wholesaler.  WAC does not represent actual transaction prices as it does not include prompt pay, rebates or other discounts in price, but it does form the baseline price at which wholesalers purchase drugs.

> Figure 1





Source: Symphony Health Solutions

Figure 1.1







From October 28, 2013, to October 30, 2013, Impax, Lannett and Par Pharmaceuticals attended the Generic Pharmaceutical Association's ("GPhA") 2013 Fall Technical Conference in Bethesda, Maryland. GPhA is a trade association for generic drug manufacturers and distributors.

In November 2013, following the GPhA conference, Lannett, Impax and Par Pharmaceuticals, in lock-step, increased Digoxin prices by over 700%. This increase marked the first significant price increase for this essential drug in more

than four years. Figure 2 below illustrates this price hike.

Figure 2



Following the coordinated price increases, market sales of Digoxin increased almost three-fold from $198 million in 2013 to $577 million in 2014.  Lannett and the other market competitors maintained the coordinated price increase through at least 2015, during which total sales of Digoxin equaled $505 million.  The sales increase was solely attributable to the November 2013 price hike as the quantity of Digoxin Tablets sold in the market remained relatively stable.

The price moves by Lannett and Impax were correlated with an unusual degree of uniformity, registering at 99% correlation.[]  At the time of the coordinated price hike, Digoxin had no supply or production issues forced the price increase for competitive business reasons.  For instance, there were no clinical investigator inspections, no drug safety labelling changes, no post market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent.

A correlation is a numerical representation of the degree of relationship between two variables. *See* (https://www.socialresearchmethods.net/kb/statcorr.php).  In cartels, or collusive markets, there is often a higher correlation between competitors' prices than in competitive markets. ***See Hide and seek: the effective use of cartel screens, OXERA,*** http://www.oxera.com/getmedia/210bc5bc-0cc9-40ea-8bc9-6c8b2406b485/Cartelscreens.pdf.aspx?ext=.pdf [].

During an earnings call on February 6, 2014, Defendant Bedrosian discussed Digoxin pricing issues. For example, Oppenheimer analyst Rohit Vanjani asked, "On Digoxin, you said that Par [Pharmaceuticals] is a rational competitor. Are you seeing anything on the pricing front from them, in terms of discounting?" To which, Defendant Bedrosian responded, "Well with discounting to our price, no. We've seen their prices discounted to the brand of course, but we're not troubled by their pricing in the market place."

Although Digoxin is not currently implicated as a focus of the State AG Complaint, there has been a recent indication that the companies who sell Digoxin – including Lannett – may become the focus of a criminal action brought by the DOJ. On January 5, 2017, the DOJ Antitrust Division submitted a Motion to Intervene in *In re Generic Drug Digoxin and Doxycycline Antitrust Litigation*, in which Lannett is currently a named defendant. In the Motion to Intervene, the DOJ asserts that the Digoxin litigation "shares common questions of law and fact with the ongoing federal criminal investigation."

120. On July 8, 2014, *The New York Times* published an article entitled "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise" (the "2014 NYT Article"), which discussed the dramatic price increases of Digoxin:

> The first sign of trouble came when Dr. Barry Lindenberg, a cardiologist, received a three-page insurance form in January, demanding he get preapproval to prescribe one of the oldest known heart medicines.
>
> … Millions of Americans still use it every day, and many had long paid just pennies a pill.
>
> <div align="center">* * *</div>
>
> What the cardiologist did not know then was that the price of generic digoxin was rapidly rising. The three companies selling the drug in the United States had increased the price they charge pharmacies, at least nearly doubling it since late last year…
>
> <div align="center">* * *</div>
>
> Digoxin provides a telling case study. There was no drug shortage, according to the Food and Drug Administration, that might explain the increase. There was no new patent or new formulation. Digoxin is not hard to make. What had changed most were the financial rewards of selling an ancient, lifesaving drug and company strategies intended to reap the benefits.

* * *

Only one of the companies, Lannett, responded to calls and emails for comment and would not discuss the specific case of digoxin, saying only in an emailed statement, "On occasion and for a variety of reasons generic drug makers can and do raise prices." Those factors, it said, included problems acquiring raw material, increased costs of complying with Food and Drug Administration requirements and manufacturers exiting the market.

Lannett, the major supplier in the United States, has benefited. The company's reported sales for cardiovascular products — its major drug in that category is digoxin — rose to $16.9 million from $4.5 million in just a few months, according to company conference calls with investors. In a February call, Arthur Bedrosian, the chief executive, said Lannett's net sales had increased 84 percent year on year, and were the best in the company's history.

### Ursodiol

121.    The Company began listing Ursodiol as one of its Key Products in its 2015 10-K.

The Company's wrongful conduct relating to Ursodiol is detailed in the Securities Class Action (at

¶¶ 70-73) and recounted as follows:

Generic Ursodiol, or Ursodeoxycholic Acid, in capsule form ("Ursodiol")[] is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and is prescribed for gallbladder stone dissolution. Ursodiol is a widely prescribed drug in the United States, particularly for older Americans. Ursodiol has been available on the generic market since 2000. Annual sales of Ursodiol in capsule form for 2015 were $433 million.

The market for Ursodiol is divided between capsule and tablet forms. The Ursodiol Capsule market is dominated by Lannett, Actavis Generics ("Actavis") and Epic Pharma ("Epic"), as illustrated in Figure 8 below. Lannett's Ursodiol sales in 2014 were $86.8 million, Actavis's sales of Ursodiol exceeded $155.2 million, and Epic's Ursodiol sales exceeded $60.7 million.

Figure 8



Prior to the Class Period, competitive market forces had drawn down the price of Ursodiol to approximately $2 per capsule. Following two generic pharmaceutical manufacturers meetings attended by Actavis, Lannett and Epic, in February and June of 2014, the price of Ursodiol shot up over 200% from $2 a unit to $5-$6 per unit, as depicted in Figure 9.

Figure 9



There were no supply shortages of Ursodiol prior to, after or during mid-2014. The FDA reported no Ursodiol shortages, there were no new patents or formulations, no labelling changes, and once in production, it is not difficult to make. Moreover, Lannett never provided a meaningful explanation for the coordinated price increases. There were no similar price hikes in other countries, including, for example, in the United Kingdom, Denmark or Norway. Thus, none of the typical reasons for a price increase existed at the time these companies increased the price of Ursodiol substantially.

### Acetazolamide

122.   The Company listed Acetazolamide as one of its Key Products in its 2016 10-K and 2017 10-K. The Company's wrongful conduct relating to Acetazolamide is detailed in the Securities Class Action (at ¶¶ 64-69) and recounted as follows:

Acetazolamide is a medication used to treat glaucoma, epilepsy, altitude sickness, paralysis and heart failure. The World Health Organization has classified Acetazolamide as an essential medicine. Acetazolamide is one of the drugs that is the subject of the State AG Complaint.

The market for the Acetazolamide is divided into a market for tablets and a market for sustained release capsules.[] The market for Acetazolamide tablets was approximately $276.9 million during the Class Period; and, the market for the sustained release capsules was worth approximately $201.6 million.

60

The market for generic Acetazolamide is highly concentrated. For the majority of the Class Period, the only two producers of Acetazolamide were Lannett and Taro Pharmaceuticals ("Taro"). Figure 5 below illustrates the highly concentrated nature of this market as close to 100% of the total sales were distributed between Lannett and Taro.

Figure 5



Acetazolamide Tablets: Total Sales %

Prior to the Class Period, Lannett had roughly 20% of the market share for Acetazolamide. However, as evidenced by the above Figure 5, from January 2009 through July 2011, Lannett's market share significantly increased, almost doubling within two years. Figure 6 shows the reason for this rapid increase in market share. Lannett had dropped its price to grab market share away from Taro. In fact, Lannett's prices moved in the complete opposite direction of Taro's price prior to the Class Period with a –99% correlation. Once the Class Period started Lannett's and Taro's prices for Acetazolamide had a 98% correlation.

In a footnote, the Securities Class Action explains "correlation" as "[t]he main result of a correlation is called a correlation coefficient and it ranges from -100% to 100% (some studies use -1.0 to +1.0). If the correlation coefficient is closer to 0 then there is no relationship between the variables. If the correlation coefficient is positive then, for example, as one variable gets larger the other gets larger. If, however, the correlation coefficient is negative then, for example, as one variable gets larger the other gets smaller.

Figure 6



The high market concentration of Acetazolamide enabled Lannett and Taro to immediately benefit from their lock-step price increases. As evidenced by Figure 7, the price of Acetazolamide jumped nearly 500% immediately following the October 2013 GPhA meeting.

Figure 7



These abnormal price moves by Lannett and Taro were correlated with an unusual degree of uniformity, registering at 98% correlation. At the time of the price hike, none of the typical reasons for a price increase existed at the time these companies increased the price of Acetazolamide substantially. Acetazolamide had no supply or production issues to justify the price increase. There were no clinical

investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent.

123.    The State AG Action 1 also includes price fixing and coordinating allegations relating to Acetazolamide.  The facts alleged describe wrongful conduct by two pharmaceutical companies other than Lannett and Taro, which further evidences the overarching conspiracy as alleged herein.

**Doxycycline Monohydrate ("Doxy Mono")**

124.    The Company's wrongful conduct relating to Doxy Mono is detailed in the State AG Action 1 (¶¶ 246-267) and recounted as follows:

Doxycycline Monohydrate ("Doxy Mono"), also known by the brand names Acticlate ® and Monodix ®, among others, is an oral medication used to treat a wide variety of bacterial infections, including those that cause acne.  Doxy Mono is known as a tetracycline antibiotic and is also used to prevent malaria.

In February 2013, Heritage heard from a customer that there would be a significant increase in demand for Doxy Mono due to a large price increase that had recently occurred with a different from of Doxycycline as well as supply problems that certain manufacturers were experiencing.

Shortly thereafter, Heritage decided to increase the price it charged for Doxy Mono.  Heritage's competitors at that time were Defendants Lannett, Mylan, and Par.  In order to ensure a successful increase, Heritage began reaching out to certain competitors.

On March 7, 2013, A.S. spoke to T.S., the Director of National Accounts at Lannett, for fourteen (14) minutes.

On March 13, 2013, A.S. sent an email to T.S. at Lannett stating: "Hi [T.S.]!  I just had a question for you on a. Doxycycline Monohydrate.  Would you have a chance to chat today?  Or tomorrow?  Let me know a convenient time for you…"  They spoke later the same day for five (5) minutes and discussed Heritage's intent to increase Doxy Mono prices.

On March 17, 2013, Malek created a spreadsheet, which he then forwarded to himself by email, which included various items on which he wanted to follow up.  Included was a reference to "Price Increases: Take Doxy Mono up more than 3x

asap." On March 21, 2013, Malek emailed Glazer expressing his intention to increase the price of Doxy Mono by as much as four (4) times the current price, and asking for Glazer's thoughts.

On March 25, 2013, T.S. sent an email to her boss, the Vice President of Sales at Lannett, titled "Recap". In that email, she indicated that she was [w]orking on a WAC & SWP review" for certain drugs, including Doxy Mono, but had heard that "there will be a price increase on Doxycycline from Heritage soon. We are waiting to find out when and why." T.S. continued to communicate with A.S. about Doxy Mono, through numerous phone conversations, text messages and in-person meetings over the next several months.

Also on March 25, 2013, Malek sent an email to his sales team indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug.

Heritage kept in contact with Doxy Mono competitors through 2013. A.S., in particular, spoke, texted and met in person with several different Lannett employees over the period. She called T.S. on April 25, 2013 and left a message. T.S. returned the call the next day and they spoke for more than eight (8) minutes. They spoke again on May 13, 2013 for almost six (6) minutes.

The next day, A.S. and T.S. attended a conference together, where they again discussed Doxy Mono. During the day on May 14, 2013, they exchanged the following text messages:

> A.S.: "Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6 "
>
> T.S.: "I have a conference call in a half hour about a market wide increase. I might have to meet you at the bar."
>
> A.S.: "Ok sounds good – see u there."
>
> A.S.: "Is it doxy mono?"
>
> T.S.: "Headed over now."

Similarly, on June 4, 2013, A.S. called and texted G.W., a Director of National Accounts at Lannett. On June 5, 2013, while at a conference with T.S., A.S. and T.S. exchanged numerous calls and text messages.

Lannett increased its pricing for Doxy Mono effective June 12, 2013. When it was asked by a customer in July 2013 whether Lannett could provide a lower price for Doxy Mono, a Lannett National Account Manager stated: "We just took a price

increase on this item effective 6/12/13. This is our standard pricing across the board going forward. Any pricing you see out there right now will not be that low for long."

During this same time period, the four competitors for Doxy Mono were all communicating frequently. For example, the day before Lannett raised its price – June 11, 2013 – N.O. of Heritage spoke to M.A. of Mylan for nearly ten (10) minutes. T.S. of Lannett was also communicating with K.O., the Vice President of National Accounts at Par, during this time period. The two were friends who frequently saw each other and spoke in person at trade shows and customer conferences. K.O., in turn, was in frequent communication was in frequent communication with M.A. of Mylan during June and July 2013, speaking numerous times, including several calls on June 7, 2013 and June 13, 2013 -the day after Lannett raised its prices for Doxy Mono. K.O. was also in frequent communication with G.W. at Lannett, exchanging nine (9) text messages on June 11 and 12, 2013.

Heritage was slower to raise its prices for Doxy Mono, due to supply problems throughout 2013. But A.S. continued to keep in frequent communication with Lannett and other competitors. She met in person with T.S. and K.O. from Par during a conference in Arizona on August 1 and 2, 2013. This was followed by a flurry of communications between the four competitors in August 2013.

At some point thereafter, as Heritage was evaluating its planned price increase, Malek asked A.S. to obtain specifics regarding Lannett's price increase for Doxy Mono. That resulted in the following text message exchange between A.S. and T.S. on August 12, 2013, after they had again met in person together at a conference:

> A.S.: "From our conversation, [i]ncreasing WAC too?"
>
> T.S.: "Yes"
>
> A.S.: "When are you guys changing WAC or have u already?"
>
> T.S.: "Are you free at 4:30?
>
> A.S.: Yes-but still need to hang around for 5pm mtg"
>
> T.S.: "OK I'll swing by"

The next day, August 13, 2013, while still together at the conference, A.S. texted T.S. saying "Let's connect sometime today-need a little more specifics on the $ we discussed." That same day, A.S. also exchanged several text messages and phone calls with L.C., another National Accounts Representative at Lannett. G.W. of Lannett also sent a text message to K.O. of Par.

Later that evening, the Senior Vice President of Generic Sales at Par sent an internal

email to the Vice President of Marketing and Business Analytics, stating: "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The email was forwarded internally at Par with the instruction: "FYI. . . . we will follow ... No new opps until we see where pricing ends up.'

One week later, on August 20, 2013, A.S. confirmed via email to Malek that Lannett had "tripled WA Cs and did/will do similar to contract prices,"

In October, A.S. informed a customer that "[w]e are expecting continued supply issues with" Doxy Mono and that "supply will be tight through Oct and Nov."

On January 23, 2014, A.S. informed a large supermarket chain customer that "I also wanted to let you [know] that we are looking to take a price increase on all the Doxy Monohydrate . . . some time in 2014."

As of March 2014, Heritage increased its price to at least one customer, with an eye toward a much larger, across-the-board increase on Doxy Mono (as well as other drugs) later in 2014, which is discussed more fully below.

This agreement between Heritage, Lannett, Par and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

125.    On information and belief, Plaintiffs allege that the reference to "T.S." in this section of the State AG Action 1 (and described as the Director of National Accounts at the Company) refers to Tracy Sullivan, the Company's Director of National Accounts.  On information and belief, Plaintiffs allege that the reference to the Vice President of Sales at the Company refers to Kevin Smith who joined the Company in 2002 as its Vice President of Sales and Marketing, and ultimately was promoted to the position of Senior Vice President of Sales and Marketing.





















███████████████████████████████████
█████████████

## THE COMPANY'S CORPORATE GOVERNANCE FAILURES

168.    Each of the Company's Form DEF 14A's filed with the SEC from 2014 through

2018 ("Proxy Statements") include a section entitled "The Role of the Board and Risk Oversight."

In each Proxy Statement, that section is followed by a representation containing the following

language (or substantially similar):

**The Role of the Board and Risk Oversight**

*The Board is responsible for overall corporate governance as well as for management and the strategic direction of the Company as a whole.*  The corporate governance guidelines are available at www.lannett.com.  The Board and various committees of the Board meet regularly to discuss operating and financial reports presented by the Company, including but not limited to the Chief Executive Officer, Chief Financial Officer, and other members of management.

*Assessing and managing risk is the responsibility of management; however, the Board, through the Audit Committee, provides oversight and reviews various details regarding the Company's risk mitigation efforts.  The Board is engaged in the Company's strategic planning efforts, which include evaluating the objectives and risks associated with these initiatives.*

*Through the Board's committees, the Board maintains broad oversight over various functions within the Company. The Audit Committee, under its charter, reviews and discusses risk exposures and the steps management has taken to monitor and mitigate each risk.  The Compensation Committee and the Governance and Nominating Committee monitor risks associated with succession planning and the attraction and retention of talent, as well as risks related to the design of compensation programs within the Company.*

The Board has adopted a Code of Business Conduct and Ethics (the "code of ethics").  The code of ethics applies to all employees including the Company's Chief Executive Officer, Chief Financial Officer, Corporate Controller, and other finance employees.  The code of ethics is publicly available on our website at www.lannett.com.  If the Company makes any substantive amendments to the code of ethics or grants any waiver, including any implicit waiver, from a provision of the code of ethics to our Chief Executive Officer, Chief Financial Officer, or Corporate Controller, we will disclose the nature of such amendment or waiver on our website or in a Current Report on Form 8-K.

> The Board has established effective anti-hedging and anti-pledging policies.  We have an insider trading policy which among other restrictions prohibits employees, officers and Directors, including Named Executive Officers ("NEOs"), from entering into short sales, calls or any other hedging transaction involving Lannett securities.  In addition, the Board has a policy that prohibits Directors and NEOs from pledging Lannett stock.  None of our Directors or NEOs has pledged Lannett stock as collateral for a personal loan or other obligations.
>
> The members of the Board are expected to attend all Board meetings whether in person or via teleconference.  Additionally, members of the Board are expected to attend the Annual Meeting.  [Emphasis added].

169.    Notably, the Company's 2013 Proxy Statement differs in its description of its oversight responsibilities, stating in relevant part:

> Assessing and managing risk is the responsibility of management; however, ***the Board provides oversight*** and reviews various details regarding the Company's risk mitigation efforts.  The Board is engaged in the Company's strategic planning efforts, which include evaluating the objectives and risks associated with these initiatives.  [Emphasis added].

170.    By comparison, the 2014-2018 Proxy Statements state:

> Assessing and managing risk is the responsibility of management; however, the Board, ***through the Audit Committee***, provides oversight and reviews various details regarding the Company's risk mitigation efforts.  The Board is engaged in the Company's strategic planning efforts, which include evaluating the objectives and risks associated with these initiatives.  [Emphasis added].

171.    The Company's representations of the Director Defendants' risk oversight in each of its Proxy Statements (from 2014 through 2018) was false and misleading and instead was used as an additional tool to secure shareholder votes to nominate each Director Defendant to the Company Board.

172.    The Director Defendants' risk oversight failures and the Officer Defendants' failures to monitor and mitigate each risk include, but are not limited to, the following events, all which relate to the Company's antitrust activities as alleged herein:

        (a)    July 2014 interrogatories and subpoena from the CTAG;

(b)     November and December 2014 – The Company, Smith and others served with DOJ grand jury subpoenas;

(c)     June 2016 – The Company employee served with State AG interrogatories and subpoena;

(d)     2016 – The Start of Private Antirust, Consumer Protection, and Shareholder lawsuits against the Company and others;

(e)     August 15, 2017 – The Direct Purchaser complaint against the Company and others regarding Digoxin price fixing;

(f)     May 2018 – DOJ Civil Investigative Demand ("CID") sent to the Company;

(g)     June 2018 – State AG Action/amended complaint filed adding the Company as a defendant;

(h)     May 2019 – State AG Action 2/second and separate complaint filed naming the Company and two Company employees as defendants; and

(i)     August 2019 – the Court denied the defendants' joint motion to dismiss the Overarching Conspiracy claims.

173.    Each of these events was known by Defendants as evidenced by ███████████ ████████████████████████████████████████████████ disclosures made in the various Form 10-K's, identified and discussed herein.

174.    Rather than take actions to protect the interests of the Company, Defendants have pursued a course of conduct to protect themselves and their "friends"

**Defendant Bedrosian**

175.    Defendant Bedrosian served as the Company's CEO and/or president through Relevant Periods 1 and 2 until his departure on December 31, 2017.  On December 21, 2017

Defendants caused the Company to announce that Defendant Bedrosian's employment end will be deemed to be a termination by the Company without Cause.

176.    Defendant Bedrosian and the Company executed a Separation Agreement where he received thirty-six (36) months base salary, a pro-rated annual cash bonus for the current fiscal year of the Company, continued medical benefits for a period of 18 months and vesting of all outstanding options and previously awarded restricted stock grants.

177.    In the Company's public filings and press releases, there is no statement or indication that the Company completed any due diligence regarding Defendant Bedrosian and his conduct relating to the allegations described herein, and specifically relating to whether his separation with the Company should properly be described as "for cause" and whether there should be any claw back of monies or other benefits paid to Defendant Bedrosian (or his entitlement to any separation payments or benefits).

**Non-Party Smith**

178.    Non-Party Smith joined the Company in January 2002 as Vice President of Sales and Marketing, and ultimately was promoted to the position of Senior Vice President of Sales and Marketing.

179.    On November 3, 2014, Smith was served with a DOJ grand jury subpoena relating to the antitrust scheme as alleged herein.

180.    On June 15, 2018, Smith exercised options of the Company for $192,600.  A review of his Company stock trading history shows he sold Company stock several times during the height of its value in 2014 and 2015.

181.    On June 22, 2018, the Company announced that Mr. Smith "will terminate his employment with the Company effective June 30, 2018.  The termination of Mr. Smith's

employment will be deemed to be a termination by Mr. Smith for Good Reason." Smith's employment agreement defines "Good Reason" as:

> For purposes of this provision, Executive resigns with "Good Reason" if he provides written notice of his resignation within thirty (30) days after Executive has actual knowledge of the occurrence, without the written consent of Executive, of one of the following events: (A) the assignment to Executive of duties materially and adversely inconsistent with Executive's status as Vice President of Sales and Marketing or a material and adverse alteration in the nature of his duties, responsibilities and/or reporting obligations, (B) a reduction in Executive's Base Salary or a failure to pay any such amounts when due; or (C) the relocation of Company headquarters more than 100 miles from its current location.

182.    Smith and the Company executed a Separation Agreement where he received twenty-one (21) months base salary, a cash bonus for the current fiscal year of the Company in the amount of $444,000, continued medical benefits for a period of 18 months and vesting of all outstanding and unvested equity award grants, and pursuant to which he has granted the Company expanded restrictive covenants.

183.    Although the Company accepted Smith's resignation for "Good Reason", the facts underlying this "Good Reason" have not been shared with the investing public, and there is no indication there was, in fact, good reason.

184.    In the Company's public filings and press releases, there is no statement or indication that the Company completed any due diligence regarding Smith and his conduct relating to the allegations described herein, and specifically relating to whether his separation with the Company should properly be described as "for cause" and whether there should be any claw back of monies or other benefits paid to Defendant Bedrosian (or his entitlement to any separation payments or benefits).

**Defendant Galvan**

185.    Defendant Galvan served as the Company's Vice President of Finance and CFO

since August 2011 and retired from those positions effective August 30, 2019.  On May 24, 2019 Defendants caused the Company to announce that Defendant Galvan's employment end will be deemed to be a termination by the Company without Cause.

186.    In the Company's public filings and press releases, there is no statement or indication that the Company completed any due diligence regarding Galvan and his conduct relating to the allegations described herein, and specifically relating to whether his separation with the Company should properly be described as "for cause" and whether there should be any claw back of monies or other benefits paid to Galvan (or his entitlement to any separation payments or benefits, if any).

**Non-Party Sullivan**

187.    Non-Party Sullivan has been employed at the Company since 2007 and is currently the Director of National Accounts.  Sullivan is a named defendant and is heavily cited in the State AG Action 2 with specific wrongful conduct relating to drug price fixing and the overarching conspiracy, including that she "exchanged at least 495 phone calls and text messages with her contacts."  *See* State AG Action 2 at ¶ 1078.

188.    In the Company's public filings and press releases, there is no statement or indication that the Company completed any due diligence regarding Sullivan and her conduct relating to the allegations described herein.

**Non-Party Cavanaugh**

189.    Non-Party Cavanaugh joined the Company as Senior Vice president and Chief Commercial Operations officer in 2018. Prior to joining the Company, Cavanaugh was the Senior Vice President, Chief Commercial Officer, North America Generics, at Teva, where she held that position for the last five of her eight years at Teva.  Cavanaugh is a named defendant and is heavily cited in the State AG Action 2 with specific wrongful conduct relating to drug price fixing and the

overarching conspiracy, including "between January 2011 and August 2017, Cavanaugh exchanged at least 612 phone calls and text messages with her contacts." *See* State AG Action 2 at ¶ 1064.

190.    Cavanaugh was hired by Defendant Crew. They previously worked together at Teva. Defendant Crew is quoted as saying about Cavanaugh: "[s]he fundamentally used to run the majority of the generics business at Teva in a bygone era when I was with her there as well some years ago as a Commercial Operating Officer."[2]

191.    In the Company's public filings and press releases, there is no statement or indication that the Company completed any due diligence regarding Cavanaugh and her conduct relating to the allegations described herein.

**Defendant LePore**

192.    Defendant LePore was appointed to the Company's Board in 2017. Since 2007, he served as Chairman, CEO, and President of Par Pharmaceuticals, Inc., until the company's acquisition by private equity investor TPG in 2012. He remained as chairman of the new company, where he led the sale of the company to Endo Pharmaceuticals

193.    After being granted leave to file an amended complaint in the State AG Action after an October 2017 motion, a State AG Action amended complaint was filed in June 2018 adding the Company and Par as defendants, and included allegations relating to the drug Doxycycline Monohydrate ("Doxy Mono") which was sold by the Company and Par. These events occurred while LePore was either Chairman, CEO, and President of Par, or Chairman of the "new company".

194.    In the Company's public announcement of its appointment of LePore to the

---

[2]    *See Lannett: Price Fixing Case Kicks The Legs Out, Fines And Management Turnover Inevitable* quoting Deutsche Bank HC Conference May 9, 2018, at https://seekingalpha.com/article/4263445-lannett-price-fixing-case-kicks-legs-fines-management-turnover-inevitable

Company's Board, there was no mention of any due diligence conducted by the Company prior to LePore's appointment, particularly related to the matters discussed herein. At a minimum, LePore's appointment to the Board and serving as its Chairman creates the appearance of wrongful conduct by the Company and/or its (and LePore's) attempt to keep the truth hidden from its shareholders, the investing public, and Plaintiffs in the various actions identified herein

## MATERIALLY FALSE AND MISLEADING STATEMENTS – ANTITRUST SCHEME

195.   On July 15, 2014, Rohit Vanjani, an Oppenheimer analyst, issued a report on the Company that discussed concerns relating to the Company's price increases which were at the center of the 2014 NYT Article. In the July 15, 2014 report, Mr. Vanjani included statements made by Defendants Bedrosian and Galvan where they stated: "Lannett's view is that the company has a window of opportunity on price increases until 2016, when the generics wave begins to recede. Management is even eyeing additional price increases later this year, although the company would not specify on which franchises. With respect to digoxin specifically, management still believes that it is at the low end of market pricing compared to competitors."

196.   On July 16, 2014, Defendants caused the Company to file a Form 8-K with the SEC and publish a press release relating to a subpoena and interrogatories it received from the Connecticut Attorney General. The press release stated in relevant part:

> Philadelphia, PA – July 16, 2014 – Lannett Company, Inc. (NYSE: LCI) today announced that it has received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law. *The Company maintains that it acted in compliance with all applicable laws and regulations* and intends to cooperate with the Connecticut Attorney General's investigation. [Emphasis added].

197.   The above statements were false and misleading, and Defendants caused the

Company to fail to disclose material facts necessary to make the statements not false and misleading.  Defendants misrepresented the Company's pricing strategy of generic drugs, including Digoxin, and Company's risk of being implicated by regulatory investigation and allegations of anticompetitive misconduct.  In addition, the statements misled investors regarding the extent to which Defendants Bedrosian and Galvan knew or recklessly disregarded the Company's participation in illegal activity related to price-fixing and/or the allocation of customers and/or territories.  Additionally, the statements downplayed the potential exposure to the Company or regulatory impact on the Company's business operations and financial results/prospects arising from its wrongful conduct

**The Company's Annual Reports**

198.    On August 29, 2014, Defendants caused the Company to file its 2014 10-K with the SEC and which was signed by Defendant Galvan and the Director Defendants (except Defendants LePore, Chapman, Crew, and Paonessa, who were not Company directors at this time).  In the 2014 10-K, the Company discussed the impact of competition:

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry.  Competition is based primarily on price.  In addition to competitive pricing our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders.  We ensure that our products are available from national suppliers as well as our own warehouse.  The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.

We compete with other manufacturers and marketers of generic and brand name drugs.  Each product manufactured and/or sold by us has a different set of competitors.  The list below identifies the companies with which we primarily compete with respect to each of our major products.

* * *

**The generic pharmaceutical industry is highly competitive.**

We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

199. In the 2014 10-K, Defendants caused the Company to make the following representations regarding its gross profit and pricing pressures:

**Gross Profit….**

The Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.

200. In the 2014 10-K, the Company further represented that there were no changes in the Company's internal control over financial reporting.

201. The 2014 10-K included certifications pursuant to Rule 13a-14(a) and 15d- 14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2014 10-K, the effectiveness of the Company's disclosure controls, and that they disclosed any material changes to the Company's internal control over financial reporting.

202.    On August 27, 2015, Defendants caused the Company to file its 2015 10-K with the

SEC and which was signed by Defendant Galvan and the Director Defendants (except Defendants

LePore, Chapman, and Crew, who were not Lannett directors at this time).   In the 2015 10-K, the

Company discussed the impact of competition:

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry.  Competition is based primarily on price.  In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders.  We ensure that our products are available from national suppliers as well as our own warehouse.  The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.

We compete with other manufacturers and marketers of generic and brand name drugs.  Each product manufactured and/or sold by us has a different set of competitors.  The list below identifies the companies with which we primarily compete with respect to each of our major products.

* * *

**The generic pharmaceutical industry is highly competitive.**

We face strong competition in our generic product business.  Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.  As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.  As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues   and   gross   profit   typically   decline,   in   some   cases dramatically.  Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval   and   launch,   in   relation   to   competing   approvals   and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

203.   In the 2015 10-K, Defendants caused the Company to make the following representations regarding its gross profit and pricing pressures stating in relevant part:

**Gross Profit**....

While the Company is continuously seeking to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.  Changes in future product sales mix may also occur.

204.   In the 2015 10-K, the Company further represented that there were no changes in its internal control over financial reporting.

205.   The 2015 10-K included a SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2015 10-K, the effectiveness of the Company's disclosure controls, and that they disclosed any material changes to the Company's internal control over financial reporting.

206.   On August 29, 2016, Defendants caused the Company to file its 2016 10-K with the SEC and which was signed by Defendant Galvan and the Director Defendants (except Defendants LePore, Chapman, and Crew, who were not Company directors at this time).  In the 2016 10-K, the Company discussed the impact of competition:

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry.  Competition is based primarily on price.  In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders.  We ensure that our products are available from national suppliers as well as our own warehouse.  The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position.

* * *

**The generic pharmaceutical industry is highly competitive.**

We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

207.    In the 2016 10-K, the Company further represented that there were no changes in the Company's internal control over financial reporting.

208.    The 2016 10-K included SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2016 10-K, the effectiveness of the Company's disclosure controls, and that they disclosed any material changes to the Company's internal control over financial reporting.

209.    On August 28, 2017, Defendants caused the Company to file its 2017 10-K with the SEC and which was signed by Defendant Galvan and the Director Defendants (except Defendants Chapman, and Crew, who were not Company directors at this time). In the 2017 10-K, the Company discussed the impact of competition:

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of

orders.  We ensure that our products are available from national wholesale, chain drug and mail-order suppliers as well as our own warehouse.  The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position.

\* \* \*

**The generic pharmaceutical industry is highly competitive.**

We face strong competition in our generic product business.  Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.  As patents for brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.  As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues   and   gross   profit   typically   decline,   in   some   cases dramatically.  Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval   and   launch,   in   relation   to   competing   approvals   and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

210.    In the 2017 10-K, the Company further represented that there were no changes in the Company's internal control over financial reporting.

211.    The 2017 10-K included SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2017 10-K, the effectiveness of the Company's disclosure controls, and that they disclosed any material changes to the Company's internal control over financial reporting.

212.    The above statements were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading.  Defendants improperly failed to disclose, *inter alia,* that: (a) the Company was a participant in the Overarching Conspiracy and/or price fixing schemes as alleged herein and in the other referenced actions; (b)

the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (c) the Company lacked internal controls over the its pricing procedures for at least six of its drug products; and (d) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements during Relevant Period 1 were materially false and misleading.

**The Company's Proxy Statements**

213.   Defendants caused the 2014-2018 Proxy Statements to be false and misleading because, despite statements to the contrary, the Company's Code of Conduct was not followed, as evidenced by the false and misleading statements alleged herein, the insider trading engaged in by some of the Defendants, and Defendants' failures to report violations of the Company's Code of Conduct.

214.   Additionally, Defendants caused the 2014-2018 Proxy Statements to be false and misleading because (a) Defendants failed to identify price fixing and/or customer/territory allocation with competitors as a risk; and (b) failed to institute and/or oversee risk mitigation efforts relating to price fixing and/or customer/territory allocation with competitors.

215.   Further, the 2014-2018 Proxy Statements also failed to disclose, *inter alia*, that: (a) the Company was a participant in the Overarching Conspiracy and/or price fixing schemes as alleged herein and in the other referenced actions; (b) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (c) the Company lacked internal controls over the its pricing procedures for at least six of its drug products; and (d) the Company failed to maintain effective internal and disclosure controls.

216.   In addition to the other reasons stated herein, Defendants also caused the 2019 Proxy Statement to be to be false and misleading because it failed to disclose the Company's planned

institution of a "retention bonus plan" which had the impact of rewarding certain executives including some of the Defendants, notwithstanding their wrongful conduct as alleged herein.

217.    As a result of the foregoing, the Company's public statements during Relevant Period 1 were materially false, misleading, and lacked a reasonable basis in fact.

**The Company's Quarterly Reports**

218.    The following are examples of the false and misleading statements contained in the Company's quarterly reports filed with the SEC on Forms 10-Q.

219.    The February 6, 2015 Form 10-Q, signed by Defendants Bedrosian and Galvan stated in relevant part:

> While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods.  Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.

220.    The May 5, 2017 Form 10-Q, signed by Defendants Bedrosian and Galvan stated in relevant part:

> Net sales were impacted by competitive pricing pressure across a number of products, product mix and changes within distribution channels. Although the Company has benefited in the past from favorable pricing trends, the trends are stabilizing and in many instances, have reversed. The level of competition in the marketplace is constantly changing and the Company cannot predict with certainty that these trends will continue.

221.    The above statements were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading.  Defendants improperly failed to disclose, *inter alia*, that: (a) the Company was a participant in the Overarching Conspiracy and/or price fixing schemes as alleged herein and in the other referenced actions; (b) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (c) the Company lacked internal controls over the its pricing

procedures for at least six of its drug products; and (d) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements during Relevant Period 1 were materially false and misleading.

<div align="center">

**THE TRUTH EMERGES – ANTITRUST SCHEME**

</div>

222.   On October 31, 2017, the CTAG filed a motion requesting, among other things, leave to amend the State AG complaint (filed in 2016 and where the Company was not a named defendant). Its proposed amended complaint added the Company as a defendant. On June 5, 2018, the Court granted this motion and on June 15, 2018, the State AG Action 1 was filed. With these filings and as the Company's participation in the antitrust scheme came to light, on October 31, 2017, the Company's share price fell from opening at $23.15 per share on October 31, 2017, to close at $19.90 the same day. And on June 15, 2018, the Company's share price fell from its June 14, 2018 closing price of $16.55, to close at $15.90 on June 15, 2018, and dropped further to close at $14.70 on Monday, June 18, 2018.

<div align="center">

**MATERIALLY FALSE AND MISLEADING STATEMENTS
AS TO THE JSP AGREEMENT**

</div>

**February 8, 2018 – Quarterly Report**

223.   On February 8, 2018, Defendants caused the Company to file a Form 10-Q for the quarter ended December 31, 2017 (the "Q2 2018 10-Q"). For the quarter, the Company reported Net Sales of $184.3 million, and Gross profit of $87.5 million. The Company also reported that "[p]urchases of finished goods inventory from JSP accounted for approximately 39% of the Company's inventory purchases during the three months ended December 31, 2017 and 2016."

224.   With respect to the JSP Agreement, the Q2 2018 10-Q stated in relevant part:

On August 19, 2013, the Company entered into an agreement with JSP to extend its initial contract to continue as the exclusive distributor in the United States of three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP;

<div align="center">92</div>

Digoxin Tablets USP; and Levothyroxine Sodium Tablets USP. The amendment to the original agreement extends the initial contract, which was due to expire on March 22, 2014, for five years through March 2019. In connection with the amendment, the Company issued a total of 1.5 million shares of the Company's common stock to JSP and JSP's designees . . . . If the parties agree to a second five year extension from March 23, 2019 to March 23, 2024, the Company is required to issue to JSP or its designees an additional 1.5 million shares of the Company's common stock. Both Lannett and JSP have the right to terminate the contract if one of the parties does not cure a material breach of the contract within thirty (30) days of notice from the non-breaching party. During the renewal term of the JSP Agreement, the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products. ***There is no guarantee that the Company will be able to meet the minimum purchase requirement for Fiscal 2018 and in the future. If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Agreement***. [Emphasis added].

225.    The Q2 2018 10-Q contained signed certifications pursuant to SOX by Defendants Crew and Galvan, stating that the Q2 2018 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

226.    The statements referenced above were materially false and misleading because Defendants failed to disclose the imminent risk or any risk of the nonrenewal of the JSP Agreement and instead created the false impression that the relationship would continue.  The only risk that Defendants disclosed with regards to JSP is that the Company could fail to meet the minimum purchase requirements, not that JSP could or would fail to renew the contract or cease supplying the Company.  Defendants made false and/or misleading statements and/or failed to disclose that the Company faced a substantial risk of the loss of the JSP Agreement.

**February 8, 2018 – Quarterly Earnings Call**

227.    On the Company's earnings call with analysts for the second quarter of 2018, Defendant Crew discussed the Company's relationship with JSP, stating:

I'm pleased to say that Arthur Bedrosian our former CEO has agreed to a strategic advisory role of the company.   He will be focused on transitioning and **strengthening our relationships with our key alliance partners of JSP and HTC among others**. I'm happy to have him on board and look forward to continue to work together. [Emphasis added].

228.   On that same earnings call, Defendant Crew was questioned by an analyst: "where do you stand on locking down an arrangement with JSP to secure your most important for now product over the longer term?" Defendant Crew stated:

Let me start with the JSP licensure first.  Obviously, it's a critical important relation we look forward to expanding that relationship overtime.  We obviously have a very long mutually beneficial relationship with the JSP, **they are a significant shareholder** and would be happy to add that to their share base. I'm optimistic, because of the number of things we have going on between the two companies that there is a big need for us to continue to partner as we have in the past"

Please note as we've announced earlier and I noted in my remarks, we have retained Arthur to facilitate and guide exactly such transactions and conversations and transitions and look forward to doing that with them.  The timeline of these sorts of transactions have their own pacing.  But it's clearly a priority and we're optimistic that well come to a good position in a relatively not-too-distant future.  [Emphasis added].

229.   In response to another question regarding the Company's relationship with JSP, Defendant Crew stated in relevant part:

Again on — there's two parties in the negotiation, we're going to have that conversation with them in terms of things that matter to them and things that matter to us.  *I want to stress that we- it's a long-term relationship with a lot of moving parts, shareholder relationships, share repurchase opportunities which I think is disclosed in all of our documents and again working with Arthur to find the way that makes sense for them and us in the way we move forward, as quickly as possible.*

So there's a renewal component as it relates to the current contract, but we would sit down with them and find out what are the things that they most care about in order to make the productive conversation, so I won't speculate here on those moving parts but just *please trust that that it is an incredibly high priority for us and that we are working with all the folks in the company, before I came and while I am here, to make sure that comes to a great outcome for both parties*.  [Emphasis added].

230.     The statements above were materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the JSP Agreement and instead created the false impression that the relationship would continue.  Defendant Crew reinforced the idea that former CEO (Defendant Bedrosian) will be "strengthening our relationships with our key alliance partners" as well as emphasized that the Lannett/JSP relationship was a "very long mutually beneficial relationship" and that "because of the number of things we have going on between the two companies that there is a big need for us to continue to partner as we have in the past."  These statements failed to address the substantial risk that the relationship would not continue and instead implied that the relationship would continue.

231.     Additionally, Defendant Crew's statement that JSP is a "significant shareholder" is false and misleading.  JSP's shareholder status was material to Plaintiffs and the investing public because it affected whether JSP maintained a vested interest in the value of the Company stock, which by extension affected whether JSP had an interest in renewing the JSP Agreement. Defendant Crew painted a picture of a continued partnership between the Company and JSP, when in reality JSP was not as vested as Defendant Crew portrayed.

232.     Further,  Defendant  Crew's  statements  were  false  and  misleading  because Defendants failed to disclose to Plaintiffs and the investing public that JSP had previously formed a partnership or other business relationship with Gemini Laboratories LLC which made the Lannett/JSP contract renewal unlikely.  As stated in relevant part in a September 28, 2017 *seekingalpha.com* article entitled "Lannett Pharmaceuticals (LCI): The Scars of Bedrosian Are Lasting, and Possibly Terminal":

> However, the greatest risk to the company isn't the acquisition of Kremers.  It's the fact that LCI does not own its lead product, Levothyroxine.  And Art has never been shy about establishing the fact that he has a great relationship with the owners of the product – that relationship is now gone… right before a renegotiation takes

place and generic competition steps up. Furthermore – the supplier has already begun establishing joint ventures with other generic manufacturers (Amneal) to take LCI's place should they desire to do so.

Levothyroxine is up to 50% of the EBIT produced by LCI, the margin profile of the product is so fat it covers up the deterioration occurring in the other aspects of the business. Interestingly – the Levothyroxine the LCI sells is owned and produced by a small long island company named "Jerome Stevens Pharmaceuticals, Inc." or JSP (LINK).

The only real success for LCI shareholders over the past 10 years is the contract that Mr. Bedrosian convinced JSP to sign. In 2004, JSP and LCI entered into an agreement for the distribution of Levothyroxine whereby JSP makes the API and final formulation and stamps out the pills - LCI just sells the product. JSP is able to raise price by 3% per year and was given 15% of the company (roughly 5.5M shares between 2003 and now). JSP does not show up as a holder so I assume they are selling shares of LCI when they are granted.

The issue at hand is that Art was responsible for striking this deal, and capping JSP at 3% price increase when he took price increases at 200% clips generated a huge amount of margin for LCI… unfortunately there are multiple reasons to believe this sweetheart deal is coming to an end.

**The folks at JSP are NOT Hillbillies**

As you can see in the screen shot below they have already formed a partnership with Gemini Labs for Levothyroxine distribution. (look at the label and you swill clearly see "JSP" on the Unithroid bottle)

* * *

**LCI's Shares Are Too Low to Strike the Same Deal, and the Debt Encumbers Their Ability to Rise**

JSP would need a very dilutive share grant to make them while for any deal that wasn't a traditional "Net Sales Agreement" whereby LCI would turn into a distributor of the product and return 80%-90% of the net sales back to JSP; or a "Profit Share Agreement" whereby LCI purchases at true cost and then returns a vast majority of the profits back to JSP.

The agreement itself is up for renewal in March of 2019, I don't know what Art said to the folks at JSP that got them to sign such a one sided deal in 2004 and then renew it in 2014 but the facts have changed materially:

1. The debt load and bad business decisions have created a public entity (LCI) that's unlikely to generate significant positive returns – thus the option value of taking shares over cash is much less enticing.
2. The architect of the deal has been fired.
3. There are multiple DMF's on file for levothyroxine and at least one Indian generic company publicly stating that their launch is eminent.
4. **JSP HAS ALREADY FORMED A VENTURE WITH GEMINI LABS (owned by Amneal) TO MARKET LEVOTHYROXINE.** [Emphasis not added; original in article]

## The Company's May 7, 2018 Quarterly Earnings Call

233.   On the Company's earnings call with analysts for the third quarter of 2018, Defendant Crew discussed the Company's relationship with JSP.  Deutsche Bank AG Analyst Gregory Gilbert asked Defendant Crew: "Just on your JSP situation, sort of the elephant in the room . . . .  Is there anything you could tell us about under what circumstances you would not proceed with extending that collaboration in some way?  Just want to understand whether you're sounding confident about getting something done versus something that looks a particular way.  So anything you're willing to say on that would be really helpful."  Defendant Crew stated:

> Yeah.  *It's a big beautiful elephant.  We embrace that as an organization.  Look, I've met with the team.*  We speak with them regularly.  They're terrific folks.
>
> *They're savvy managers.  We have a great dialog on an ongoing basis, all the various moving parts and I believe they are very supportive of the initiatives that we've been talking about.*  I don't want to put the cart in front of the horse, elephant aside, but *I'm optimistic that we'll get a chance to renew this agreement when it's right for both parties.*  There is clearly nothing more important to our business than doing so and we'll continue to be focused on doing just that.  [Emphasis added].

234.   The statements above were materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the JSP Agreement and instead created the false impression that the partnership would continue.  When Analyst Gilbert directly asks about the future of the Company's relationship with JSP, Defendant Crew promoted the positive progress the Company had made and how it was well-received by partners.  Defendant Crew hid the fact that the relationship with JSP was uncertain, particularly given that JSP had formed a relationship with the well-established levothyroxine distributor Gemini as well as liquidating the majority of the 5.5 million shares that JSP had been issued since 2004.

**The Company's May 8, 2018 – Quarterly Report**

235.   On May 8, 2018, Defendants caused the Company to file its Form 10-Q for the quarter ended March 31, 2018 (the "Q3 2018 10-Q").  For the quarter, the Company reported Net Sales of $174.4 million, and Gross profit of $67.1 million. The Company also reported that "[p]urchases of finished goods inventory from JSP accounted for approximately 37% and 33% of the Company's inventory purchases during the three months ended March 31, 2018 and 2017, respectively."

236.   With respect to the JSP Agreement, the Q3 2018 10-Q again merely stated, in relevant part:

> During the renewal term of the [JSP Agreement], the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products. There is no guarantee that the Company will be able to meet the minimum purchase requirements. If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Agreement.

237.   The Q3 2018 10-Q contained signed certifications pursuant to SOX by Defendants Crew and Galvan, stating that the Q3 2018 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

238.   The statements referenced above were materially false and misleading because Defendants fail to disclose the imminent risk or any risk of the non-renewal of the JSP Agreement. The only risk that Defendants disclose with regards to JSP is that the Company may fail to meet the minimum purchase requirements, not that JSP may fail to renew the contract or discontinue supplying the Company.

**The Company's May 9, 2018 – Deutsche Bank Health Care Conference Call**

239.   On May 9, 2018, the Company participated in the Deutsche Bank Health Care Conference.   At the Conference, Defendant Crew addressed the Company's key partnership with JSP:

> Looking a bit beyond that, we obviously want to continue to drive our internal pipeline, whether it's externally or internally sourced.   Internally, we'll focus again on some of the pain management opportunities and solutions where we have some distinctive capabilities.   And on the external side, be more thoughtful about technologies and specialized capabilities to bring into our portfolio.

> And last but not least, and as you've seen if you've been tracking the company of late, we do want to continue to leverage our mid-market position where we see the generic as a big blue ocean of opportunity that is providing many opportunities first to our business, and position ourself as a partner of choice for these companies.

> *A number of other suppliers, you see them on the right side of the slide have – they're believing in that positioning and bringing their products to us.   Everything from long-standing partnerships with Jerome Stevens, the basis of our levothyroxine product as well as new partners from Aralez to Sciecure to Cerovene and Dexcel and others.   And we look forward to their contributions to our revenues as we move forward.* [Emphasis added].

240.   At the conference, Deutsche Bank AG Analyst Gregory Gilbert again asked Defendant Crew about the status of the Company's relationship with JSP: "Just looking at your last slide there, you spent a fair amount of time on levo.   Missing from that slide is your prediction of

what will actually happen with the durability of the product for you and your relationship. So here's your opportunity to clarify what is going to happen." Defendant Crew responded:

> So I think I alluded in every company has its concerns and issues. What Gregg is referring to here is our contract with this long-term partnership JSP. ***It does have a technical expiration date of March of next year.*** And I think some of the concerns for our company and the valuations you see is about the persistency of that contract. While again, I'm very careful not to indicate what another party will do, our partners at Jerome Stevens are proud, bright and capable businessmen, and they don't need me to speak for them relative to their exact intentions. And I wouldn't presume to do so.
>
> ***However, I would note that they're one of our largest shareholdings with the company and they are businessmen that are closely watching the sort of changes we're making to the business, and I believe applaud it. And as a result, I'm confident when their time is ready, we'll get to that renewal.*** [Emphasis added].

241.   The statements above was materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the distribution contract with JSP and instead perpetuated the false impression that the relationship would continue. Defendant Crew stated that the JSP Agreement had "a technical expiration date of March of next year" which implied that the functional expiration would be something different, presumably beyond the "technical expiration" or never to occur at all. Additionally, Defendant Crew noted that JSP was "one of [Lannett's] largest shareholdings," yet despite being issued 5.5 million shares since 2004, which equated to almost 15% of the 38 million shares of currently issued the Company stock, was not even a beneficial holder of record. Defendant Crew misled the public to believe that JSP had a vested interest in the Company, when in fact, JSP was not.

### THE TRUTH EMERGES - JSP

242.   On August 20, 2018, the Company issued a press release:

Lannett Company, Inc, today said that its distribution agreement with Jerome Stevens Pharmaceuticals (JSP), which expires on March 23, 2019, will not be renewed. "

The Steinlauf family advised us this past Friday evening that they will not renew our agreement to distribute three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP, Digoxin Tablets USP and Levothyroxine Sodium Tablets USP, upon its expiration in March 2019," said Tim Crew, chief executive officer of Lannett. "The family has assured us of a continuous supply of the products through March of next year. These products remain valuable assets for us and are expected to significantly contribute to our financial performance in fiscal 2019. "While we are disappointed and intend to redouble our continuing efforts to explore options for addressing our capital structure, we have been preparing for this contingency, knowing that this outcome was a possibility.

Accordingly, we have been focused on improving our already strong base commercial business of more than 100 currently marketed products. Since the beginning of this year, we added new products to our offering and expanded our customer base. We continued to streamline our operations. Specifically, we successfully launched eight new products in the first seven months of calendar 2018, which we estimate will add net sales in excess of $50 million in fiscal 2019, and in addition to our launches, we completed several transactions to add more than 25 market-ready or near-market-ready product lines to our pipeline.

Importantly, we continue to make excellent progress advancing other previously approved products toward launch and plan to commence marketing a substantial number of them in the coming months and throughout fiscal 2019.

"In addition, in our current fiscal year, we have already submitted four drug applications associated with two product families, implemented a restructuring plan at our Cody Laboratories subsidiary and streamlined our product distribution function.

"Looking ahead, our team is actively evaluating a number of additional potential transactions to add even more products to our portfolio to grow revenues and profits and diversify our business. We have more than 20 owned and partnered drug product applications currently pending at the FDA and anticipate a significant number of product approvals in fiscal 2019. We also expect to expand restructuring initiatives to further reduce expenditures. Finally, we are evaluating the impact of this contract ending in March 2019 on our goodwill."

243.    On this news, the Company's share price dropped $8.15, or 60.3%, to close at $5.35 on August 20, 2018.

244.    On August 23, 2018, Defendants caused the Company to file a Form 8-K with the SEC which discussed the nonrenewal of the JSP Agreement.  The Form 8-K attached the above referenced August 20, 2018 press release and provided additional information regarding goodwill

impairment, stating in relevant part:

> As a result of the nonrenewal of the exclusive distribution agreement with Jerome Stevens Pharmaceuticals ("JSP"), as more fully discussed in Item 8.01 below, Lannett Company, Inc. (the "Company") *has determined that such nonrenewal represents a "triggering event"* under United States Generally Accepted Accounting Principles (US GAAP) and, accordingly, *will perform an analysis to determine the potential for impairment of goodwill and certain long-lived assets* of the Company in the first quarter of fiscal 2019. *As of June 30, 2018, the carrying value of goodwill was $339.6 million*. The Company believes that its impairment assessment will likely result in a material impairment of the Company's goodwill; however, at this time the Company cannot estimate an amount or range of amounts for such impairment. Any impairment would result in a noncash charge to earnings in the first quarter of fiscal 2019.
>
> <div align="center">* * *</div>
>
> After the close of business on August 17, 2018, JSP notified the Company that JSP will not extend or renew the exclusive distribution agreement between JSP and the Company, pursuant to which the Company distributes Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP, Digoxin Tablets USP and Levothyroxine Sodium Tablets USP, when the current term of the exclusive distribution agreement expires on March 23, 2019. *Net sales of JSP products totaled $253.1 million in fiscal year 2018. Of that amount, Levothyroxine Sodium Tablets USP net sales totaled $245.9 million, with gross margins of approximately 60%, in fiscal year 2018*. [Emphasis added].

245.    On October 5, 2018, Defendants caused the Company to file a Form 8-K/A with the

SEC which amended the August 23, 2018 Form 8-K discussed above.  This Form 8-K/A stated in

relevant part:

> On August 23, 2018, Lannett Company, Inc. (the "Company") filed a Current Report on Form 8-K (the "Original 8-K") with the Securities and Exchange Commission reporting that the Company's exclusive distribution agreement with Jerome Stevens Pharmaceuticals would not be renewed when the current term expires on March 23, 2019. The Company also reported in the Original 8-K that it was undertaking an analysis with respect to the goodwill and certain long-lived assets of the Company to determine any potential impairment of such assets. *At the time the Original 8-K was filed, the Company was not able in good faith to estimate any amount or range of amounts of any impairment*. The Company is filing this Amendment No. 1 to amend the Original 8-K to report that there will be an impairment charge with respect to the goodwill of the Company. The disclosure included in the Original 8-K otherwise remains unchanged.

<div align="center">* * *</div>

> On October 4, 2018, the Company concluded based on market data that *it expects to*
> *report an impairment charge of approximately $339.6 million relating to the*
> *goodwill of the Company, resulting in a full impairment of the goodwill of the*
> *Company*. This non-cash impairment will be reported in the Company's results of
> operations for the three months ending September 30, 2018, and has no impact on
> the Company's financial covenant leverage ratio. The Company is still in the process
> of finalizing its assessment for impairment of certain long-lived assets. [Emphasis
> added].

246.   On December 10, 2018, Defendants caused the Company to file its Form DEF 14A

with the SEC in anticipation of its January 23, 2019 annual meeting of stockholders (the "2019

Proxy Statement").   In the 2019 Proxy Statement, Defendants asked Plaintiffs and all other

Company shareholders of record to (1) elect seven members of the Board of Directors, (2) ratify

the selection of the independent auditor, (3) provide an advisory vote on executive compensation,

and (4) approve the amendment to and restatement of the 2014 Long-Term Incentive Plan (the

"2014 Plan").

247.   The 2019 Proxy Statement did not mention any "retention bonus plan" (discussed

hereunder) that was under consideration by the Director Defendants.

248.   On December 18, 2018, Defendants caused the Company to file a Form 8-K with

the SEC announcing that the Director Defendants adopted a retention bonus plan in the amount of

one year's base salary for certain executives, including but not limited to, Defendants Crew, Galvan,

and Kozlowski.  This Form 8-K states in relevant part:

> On December 13, 2018, the Board of Directors of Lannett Company, Inc. (the
> "Company") adopted a retention bonus plan (the "Retention Plan") that applies to
> the following executive officers of the Company: Timothy C. Crew, Martin P.
> Galvan, Samuel H. Israel, John Kozlowski, John Abt, Robert Ehlinger and Maureen
> Cavanaugh (collectively, the "Participants"). The purpose of the Retention Plan is
> to ensure that the expertise of such Participants is preserved for the benefit of the
> Company through at least December 1, 2019.
>
> Pursuant to the Retention Plan, each Participant will receive a retention bonus in the
> amount of one year of his current base salary in the event that such Participant (i)
> remains employed by the Company and performs his duties and responsibilities in a

satisfactory manner through December 1, 2019 or (ii) is terminated other than for Cause (as such term is defined in each Participant's employment agreement with the Company) before December 1, 2019.

## DERIVATIVE ALLEGATIONS

249.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, waste of corporate assets, and unjust enrichment by Defendants.

250.    Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

251.    Plaintiffs are shareholders of Company common stock at the time of the wrongdoing of which Plaintiffs complain and have been continuously since.

252.    Before filing this derivative action, Plaintiffs demanded that the Board take action to investigate the misconduct alleged herein and, if warranted, to commence litigation against Defendants.  Specifically, on December 12, 2018, Plaintiffs made a written demand on the Board to investigate and address the misconduct and, if warranted, to commence litigation against Defendants.  A true and correct copy of Plaintiffs' demand letter is attached hereto as Exhibit A (the "Litigation Demand").







260.   In addition to the DOJ investigation and State AG Action, there are many other Private Antitrust and Consumer Protection litigation actions.   To date, the DOJ investigation has resulted in three guilty pleas.  On April 6, 2017, the Judicial Panel on Multidistrict Litigation (the "JPML") ordered that all of the cases alleging price-fixing for generic drugs be consolidated for pretrial proceedings in the United States District Court for the Eastern District of Pennsylvania under the caption In re: Generic Pharmaceuticals Pricing Antitrust Litigation, including the State AG Action.  On August 15, 2019, the Court denied the defendants' joint motion to dismiss the overarching conspiracy claims.  It has been approximately nine months since Plaintiffs sent their Litigation Demand.  If the Board was going to act on the demands set forth in the Litigation Demand, they would have done so by now, but have not.

## COUNT I

### (Against Defendants for Breach of Fiduciary Duty)

261.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

262.   Defendants owed the Company fiduciary obligations.  By reason of their fiduciary

relationships, Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

263.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

264.    Regarding the Antitrust scheme, Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by (1) failed to identify price fixing and/or customer/territory allocation with competitors as a risk; (2) failed to institute and/or oversee risk mitigation efforts relating to price fixing and/or customer/territory allocation with competitors and related disclosure and internal control failures; (3) failed to ensure that the Company, and its directors and officers, complied with federal laws; (4) failed to conduct an adequate investigation of known potential (and/or actual) violations of federal laws; and (5) participated in a course of conduct to protect themselves and their "friends" by failing to conduct adequate due diligence prior to the end of employment of any employee and/or authorizing and instituting its retention bonus plan as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

265.    Regarding Defendants alleged misconduct relating to the JSP Agreement, Defendants knowingly or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) JSP was not a substantial shareholder of the Company; (2) as a result, JSP did not have a vested interest in the Company; and (3) the JSP Agreement would not be extended beyond March 2019.

266.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged

herein, Defendants are liable to the Company.

267.   As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Insider Trading Defendants for Breach of Fiduciary Duty)

268.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

269.   The Insider Trading Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, The Insider Trading Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.  The Insider Trading Defendants were also obligated to comply with the Company's Code of Conduct, Corporate Governance Guidelines, and Insider Trading Policy

270.   During Relevant Period 1 and at the time of the insider stock sales, including but not limited to, the sales identified herein, the Insider Trading Defendants collectively sold tens of thousands of shares of Company common stock while in possession of material non-public information.  These sales placed the Insider Trading Defendants' shares into the open market at fraudulently inflated prices at a time that the Board was causing the Company to participate in an industry-wide conspiracy to fix the price of generic drugs and/or allocate customers and/or territory in violation of federal and state laws and regulations.

271.   The information described herein was proprietary non-public information

concerning the Company's operation, financial condition, and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold their Company common stock.

272.  At the time of their stock sales, the Insider Trading Defendants knew and/or were engaging in a scheme to cause the Company to commit to a business plan premised on a widespread price fixing and/or customer/territory allocation schemes that violated federal and state law. The Insider Trading Defendants' sales of Company stock, while in possession and control of this material adverse nonpublic information, was a breach of their fiduciary duties of loyalty and good faith, and the concealment of this material non-public information allowed the Insider Trading Defendants to knowingly sell their shares at artificially inflated prices.

273.  The Insider Trading Defendants' sales were inconsistent with past trading patterns and suspicious in their timing and amounts.

274.  As a direct and proximate result of the Insider Trading Defendants' insider sales and breach of fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm. Because the Insider Trading Defendants used the Company's proprietary information for their own gain, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained.

## COUNT III

### (Against Defendants for Waste of Corporate Assets)

275.  Plaintiffs incorporate by reference and reallege each and every allegation contained

above, as though fully set forth herein.

276.    The wrongful conduct alleged regarding the Company's participation in the antitrust schemes and its issuance of false and misleading statements was continuous, connected, and ongoing throughout the Relevant Periods.  It resulted in continuous, connected, and ongoing harm to the Company.

277.    As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

278.    As a result of the waste of corporate assets, Defendants are liable to the Company.

279.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT IV

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act

280.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

281.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness regarding these nonfraud claims.

282.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such

rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest

or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or

consent or authorization in respect of any security (other than an exempted security) registered

pursuant to section 12 of this title [15 U.S.C. § 78l]."

283.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to

state any material fact necessary in order to make the statements therein not false or misleading."

17 C.F.R. §240.14a-9.

284.    Director Defendants caused each of the Proxy Statements to be false and misleading

because, despite statements to the contrary, the Company's Code of Conduct was not followed, as

evidenced by the false and misleading statements alleged herein, the insider trading engaged in by

some of the Defendants, and Defendants' failures to report violations of the Company's Code of

Conduct.

285.    Additionally, the Director Defendants caused each of the Proxy Statements to be

false and misleading because (a) Defendants failed to identify price fixing and/or customer/territory

allocation with competitors as a risk; (b) failed to institute and/or oversee risk mitigation efforts

relating to price fixing and/or customer/territory allocation with competitors.

286.    Further, each of the Proxy Statements also failed to disclose, *inter alia*, that: (a) the

Company was a participant in the Overarching Conspiracy and/or price fixing schemes as alleged

herein and in the other referenced actions; (b) the Company's financial results and growth were not

the product of a competitive market or the Company's strong leadership; (c) the Company lacked

111

internal controls over the its pricing procedures for at least six of its drug products; and (d) the Company failed to maintain internal controls.

287.    Each of the Proxy Statements also failed to disclose that Defendants have pursued a course of conduct to protect themselves and their "friends" as detailed herein rather than take actions to protect the interests of Plaintiffs and all other Company shareholders.

288.    In addition to the other reasons stated herein, Defendants also caused the 2019 Proxy Statement to be to be false and misleading because it failed to disclose the Company's planned institution of a "retention bonus plan" which had the impact of rewarding certain executives including some of the Defendants, notwithstanding their wrongful conduct as alleged herein.

289.    In the exercise of reasonable care, Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements discussed herein were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in these Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

290.    The false and misleading elements of the Proxy Statements led to the election or re-election of the Director Defendants and allowed them to continue breaching their fiduciary duties to the Company.

291.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in these Proxy Statements.

292.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT V

### Against Defendants for Gross Mismanagement

112

293.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

294.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

295.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

296.    Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A)    Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

(B)    Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)    Awarding Plaintiffs the costs and disbursements of this action, including attorneys',

accountants', and experts' fees; and

(F)    Awarding such other and further relief as is just and equitable.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  September 17, 2019              **COOCH AND TAYLOR, P. A.**

                                        */s/ Blake A. Bennett*
                                        Blake A. Bennett #5133
                                        The Nemours Building
                                        1007 N. Orange Street, Suite 1120
                                        Wilmington, DE 19801
                                        Telephone: (302) 984-3800
                                        Facsimile: (302) 984-3939
                                        E-mail: bbennett@coochtaylor.com
                                        *Attorney for Plaintiffs*

**OF COUNSEL**
**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com
*Attorneys for Plaintiffs*

114